No. 97,759

STATE OF KANSAS, *Appellee*, v. RUBEN Y. WARLEDO, *Appellant*.

(190 P.3d 937)

928

Opinion filed August 8, 2008.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause, and *Jennifer E. Conkling*, of the same office, was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Paul J. Morrison*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Ruben Y. Warledo appeals from his convictions of arson and premeditated first-degree murder and his hard 50 life sentence for the murder conviction. Warledo raises a number of issues, including whether: (1) the trial court erred by admitting into evidence statements he made to authorities before he was given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966); (2) the trial court erred by admitting into evidence a video of Warledo, by himself, in the interrogation room because (a) Warledo made an unequivocal request for counsel which should have been subsequently honored by the interrogating officers and (b) the jury was allowed to hear his request for counsel in the context of a murder investigation; (3) the trial court erred by admitting evidence of Warledo's prior crimes and civil wrongs in violation of K.S.A. 60-455; (4) the trial court abused its discretion by admitting gruesome photographs of the victim when the cause and method of death were not in dispute; (5) the prosecutor committed misconduct and deprived Warledo of a fair trial by misstating the law regarding premeditation during closing argument; (6) the trial

court erred by imposing a hard 50 sentence in that the identical offense sentencing doctrine mandated a lesser penalty equal to that of intentional second-degree murder; (7) the trial court abused its discretion in weighing the aggravating and mitigating circumstances and concluding that a hard 50 sentence was warranted; (8) the hard 50 sentencing scheme is unconstitutional; and (9) cumulative errors denied Warledo a fair trial.

We reject Warledo's arguments and affirm his convictions and hard 50 life sentence.

## FACTS

It is undisputed that Warledo killed his mother, Marcia Squirrel, by repeatedly stomping on her as she was lying on the floor of her kitchen. He then set fire to her body. The primary issue for the jury to determine was whether Warledo premeditated the murder.

During the attack, Squirrel was apparently able to dial 911 on a cellular phone. Emergency dispatch received the call but never spoke directly with anyone. The emergency dispatch operator recorded the call, which captured the yelling of a man—later identified as Warledo—in the background. Also, for the first couple of minutes during the attack, Squirrel could be heard moaning. Stomping, pounding sounds emanated intermittently as Warledo yelled and ranted his hatred toward Squirrel, calling himself "Satan" and his mother "sick" and a "nasty whore." Sometimes Warledo would pause and then start stomping again. At one point after a pause, he said something to the effect, " 'You want to live? You want to live? You're not gonna live. Die. Die. Die.' " Then, he stomped some more.

Warledo noticed that Squirrel was still moving, and he feared she would call the police. He knew he needed to get away, so he began emptying his closet and packing his clothes in his vehicle. Warledo then returned to the residence to "burn up the evidence." He poured lighter fluid over Squirrel's face and set her on fire.

While Warledo was committing the crimes, the dispatch operator was able to contact the cell phone provider, obtain a billing address for the telephone, and dispatch law enforcement officers to the address. When officers arrived they found Warledo standing

outside, but he quickly went inside and slammed an interior door when the officers called his name. They then spotted Warledo running out an opposite door. Officers stopped Warledo, and he repeatedly told them to "check my mom." After he was handcuffed, the officers noticed smoke coming out of the house. When the fire was extinguished, officers found Squirrel dead on the kitchen floor.

Officers put Warledo, who had been drinking heavily throughout the day, inside the B.A.T. (breath alcohol testing) van while they searched the house. On the way to the van, Warledo stated, " 'I killed my mom. I killed my mom because I'm evil.' " Then, Warledo lowered his voice, stepped toward one of the officers, and said he "had to do it" to protect his family from the Bloods gang. After being placed in the van, Warledo began banging his head on the divider and yelling about spiders and snakes. Officers shackled him to keep him from further injuring himself.

Warledo was transported to an interrogation room at the Wichita Police Department. His feet were shackled and his hands were cuffed to the table. Warledo was then left alone in the room for 30 to 40 minutes. A video camera recorded the events inside the interrogation room, but the camera was not monitored during the recording process. Subsequent viewing of the video showed that, while alone, Warledo cried and muttered to himself. Towards the end of his wait, while still alone, Warledo loudly stated, " 'I need to call a lawyer. Where's my lawyer?' "

Approximately 5 minutes later, Investigator David Higday from the Kansas State Fire Marshal's office, Detective Robert Chisholm, and another detective entered the interrogation room for the purpose of gathering and processing physical evidence from Warledo. They were unaware of Warledo's solitary statements regarding an attorney. Before Detective Chisholm could fully conduct introductions or could even explain to Warledo why they were there, Warldo started making statements like, " 'I admitted what I did. I'll sign anything you want. I did it. I did it. I did it.' " Chisholm testified he told Warledo he did not want to talk to him about that right now. At one point Warledo asked Chisholm if his mother was dead, and the detective said, "Yes." Although Chisholm could not remember Warledo's specific response, the detective indicated his

response was "very unemotional." The second detective, a female, left the room when it was time for Warledo to change his clothes.

Over the course of approximately 30 minutes, Investigator Higday took photographs of Warledo, gathered his clothing and shoes, and swabbed his extremities for samples. While the fire investigator was collecting evidence, Warledo repeated that he would "sign anything" because "he did it." Warledo also made statements about stomping on his mother and physically demonstrated the stomping motion with his feet. About 7 or 8 minutes into their time with Warledo, Higday wanted to ask him about the use of accelerants on the fire, so Warledo was verbally *Mirandized*. When asked, Warledo said he had used Kingsford lighter fluid.

After collecting the physical evidence, Chisholm and Higday left the interrogation room. Detective Chisholm then returned shortly thereafter to question Warledo about the events. First, the detective filled out a personal history sheet with Warledo. According to the detective, Warledo understood the questions and gave appropriate responses.

Upon completing Warledo's personal history, Detective Chisholm then *Mirandized* Warledo a second time by providing him with a written waiver, which Warledo read to the detective and signed. Warledo explained the chronology of what happened. He indicated he came home intoxicated and went in search of something to eat. Squirrel confronted him about his drinking and slapped him in the face. In response, Warledo struck his mother with enough force to knock her down. Warledo admitted he "flipped out" and started kicking and stomping his mother. He said he could not remember everything, but he remembered going outside to get the lighter fluid and bringing it back in the duplex. Warledo told detectives he did not remember setting the fire. But at another point Warledo said he lit the fire because "[t]hat's what you do . . . [to] burn up the evidence."

At trial, evidence was admitted regarding the cause of death. Forensic testing indicated that Squirrel was alive well into the attack, but her body was set on fire postmortem. The cause of death was blunt force trauma to the head and neck. Squirrel suffered

approximately 7 blows to the face, 10 to the head, 1 to the neck, and 1 to the chest.

Based upon this evidence, a jury convicted Warledo of arson and premeditated first-degree murder. Before sentencing, the State presented a notice of intent to seek a hard 50 life sentence on the murder conviction by offering aggravating factors pursuant to K.S.A. 21-4636. Warledo objected to the constitutionality of the hard 50 statute on the basis that the sentencing court could not make a finding of aggravating circumstances under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

In addition, at the sentencing hearing, Warledo presented evidence that his mother had abused him, emotionally and physically. In addition, evidence established that Warledo suffered from depression, alcoholism, and drug abuse and had attempted suicide on several occasions, the most recent attempt occurring approximately 2 months before he killed his mother. After that attempt, Warledo was hospitalized in a psychiatric unit and was placed in alcohol and drug treatment for 6 weeks. As part of Warledo's treatment, he was to take medication for depression. Nevertheless, he stopped taking the medication, along with his diabetes medication, several days before the murder.

As a result of his mental illness, lack of medication, and alcohol use, Dr. William Albott, a psychologist, opined that Warledo suffered from a mental disease or defect on the night of the attack, as shown by his "psychotic behavior." In Dr. Albott's opinion, when Warledo attacked his mother he was acting in a psychotic rage in reaction to his mother, whom he perceived as a threat. It was also Dr. Albott's opinion that Warledo generally suffers from "major depression without manifest psychotic features."

After hearing this evidence, the sentencing court recognized that some level of mental or emotional "disturbance" existed and that Warledo's capacity to appreciate "the criminality of his conduct at the moment in time was substantially impaired." Recognizing the existence of this mitigating factor, the court also found that there was an aggravating factor. Specifically, the court found it significant that there were continuous acts of violence—continual stomping—

which began before the killing and continued afterward. Moreover, the body was desecrated by fire, which the court found indicated a particular depravity of mind. The court also found the infliction of mental anguish or physical abuse before the victim's death. These factors, according to the sentencing court, supported the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. Finding that the aggravating circumstance outweighed any mitigating circumstances, the court imposed the hard 50 sentence.

Warledo now appeals, raising the nine issues listed above. This court has jurisdiction over the appeal under K.S.A. 22-3601(b)(1) (life sentence; off-grid crime).

## 1. *Miranda*

First, Warledo contends the trial court erred by admitting into evidence his incriminating statements made to authorities in the interrogation room before he was verbally *Mirandized*. Warledo argues that the purpose behind Detective Chisholm's and Investigator Higday's presence in the room—the collection of physical evidence such as photographs, clothing, and swabs—was equivalent to police interrogation in that the authorities should have known their actions were likely to elicit an incriminating response from him. The specific statements with which Warledo takes issue are: " 'I admitted what I did. I'll sign anything you want. I did it. I did it. I did it.' "

The issue of whether the statements were admissible was first raised when, prior to trial, the State filed a *Jackson v. Denno* motion to determine the voluntariness of Warledo's statements. See *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964). At the hearing, the trial court found that the statements were admissible because Warledo voluntarily waived his rights under the Fifth Amendment to the United States Constitution, stating that "the oral *Miranda* [was] given, and before that's given, he's volunteering statements as to what he's done."

This ruling, and the procedure leading to it, frame our standard of review: When a trial court conducts a *Jackson v. Denno* hearing, determines a defendant's statements were freely, voluntarily, and

knowingly given, and admits the statements into evidence at the trial, an appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard and reviews the ultimate legal conclusion drawn from those facts de novo. In doing so, an appellate court does not reweigh evidence or assess the credibility of the witnesses but will give deference to the trial court's findings of fact. *State v. Harris*, 279 Kan. 163, 167, 105 P.3d 1258 (2005).

We apply this standard to well-established rules regarding custodial interrogations and an accused's constitutional rights. The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent. *Miranda*, 384 U.S. at 479. The United States Supreme Court and this court have recognized that these rights are " 'sufficiently important to suspects in criminal investigations' " to require that a defendant subject to custodial interrogation be fully advised of his or her rights through the giving of the *Miranda* warnings so that any waiver of such rights be knowing and intelligent. *State v. Henry*, 273 Kan. 608, 613, 44 P.3d 466 (2002) (quoting *Davis v. United States*, 512 U.S. 452, 458, 129 L. Ed. 2d 362, 114 S. Ct. 2350 [1994]); see *Edwards v. Arizona*, 451 U.S. 477, 489, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981) (Powell, J., concurring). If a suspect knowingly and intelligently waives these rights, law enforcement officers are free to ask questions. *North Carolina v. Butler*, 441 U.S. 369, 372-73, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979).

The questions of voluntariness and waiver do not arise, however, if the essential requirements for triggering the *Miranda* safeguards are not present. Those essential requirements are that an accused must be (1) in custody and (2) subjected to interrogation. *Miranda*, 384 U.S. at 479. In this case, there is no dispute that Warledo was in custody. The issue is whether Warledo was subjected to interrogation before he was given the *Miranda* warnings.

The term "interrogation" under *Miranda* refers not only to express questioning but also its functional equivalent, which has been defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police

should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980); see *State v. Woolverton*, 284 Kan. 59, 70-71, 159 P.3d 985 (2007) (*Miranda* warnings required for all custodial interrogations). The test of whether the officers should know their words or actions are reasonably likely to elicit an incriminating response, so as to amount to the functional equivalent of interrogation, is an objective one. Even so, the officers' intent is not necessarily irrelevant. *Innis*, 446 U.S. at 301-02 n.7; see also *United States v. Cooper*, 19 F.3d 1154, 1162 (7th Cir. 1994) ("Where an objective observer would believe that the encounter was reasonably likely to elicit an incriminating response from the defendant, the court will find that the encounter constituted the 'functional equivalent' of interrogation.").

It follows from these rules that if a statement by an accused is made without interrogation or its functional equivalent, the statement may be admissible under the *Innis* rule or its progeny even if the *Miranda* warnings were not given. As a result, spontaneous, volunteered statements are admissible even when " ' "made after the accused is arrested and in custody." ' [Citations omitted.]" *State v. Lackey*, 280 Kan. 190, 225, 120 P.3d 332 (2005), *cert. denied* 547 U.S. 1056 (2006), *overruled in part on other grounds State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007).

In the present case, the trial court found Warledo's statements were made without interrogation and were spontaneous and volunteered. The video of Warledo's time in the interrogation room supports this conclusion by showing Warledo blurting out the statements he seeks to suppress as soon as the fire investigator and detectives entered the room. His statements were made *before* Detective Chisholm told Warledo that they would be performing some "processing" and *before* any evidence was collected. As a result, we need not discuss his contention that the authorities' collection of physical evidence from his person was the functional equivalent of an interrogation. Warledo voluntarily spoke before any evidence collection took place.

The trial court did not err by admitting Warledo's statements into evidence.

## 2. *Video*

Next, Warledo contends that he was prejudiced and denied his due process rights because (a) the law enforcement officers questioned him despite his "request for counsel" and (b) the jury was allowed to hear his "invocation of his Fifth Amendment rights" in the context of a murder investigation. This claim is based upon Warledo's statement made toward the end of his 30- to 40-minute wait alone in the interrogation room, "I need to call a lawyer. Where's my lawyer?"

The trial court determined this statement was an unequivocal request for counsel but that no officers were aware of the statement. The record provides substantial competent evidence to support this conclusion because, according to the uncontroverted testimony, officers neither accompanied Warledo at the time of the statement nor monitored the video camera as this "event" unfolded. As a result, the trial court determined the interrogating officers could not be faulted for failing to honor Warledo's request, meaning there was no basis to apply the exclusionary rule.

*Miranda.* The trial court's analysis is correct. Invoking the *Miranda* right to counsel, which may occur at any time, "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 115 L. Ed. 2d 158, 111 S. Ct. 2204 (1991). This rule has two aspects. First, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. Second, the request must be for assistance with the custodial interrogation, not for subsequent hearings or proceedings. *McNeil*, 501 U.S. at 178.

The rule that the request must be one that a reasonable officer would understand implies that a law enforcement officer must be aware of the request. Here, there were no officers present in the room, so Warledo was not making a request to anyone who could grant it. The admission of such statements did not violate Warledo's *Miranda* rights, since such rights were not properly invoked.

_Doyle_. In addition, Warledo argues it was improper to allow the jury to hear his request for counsel when it viewed the video. He argues this portion of the video should have been muted. To support his argument, he cites _Doyle v. Ohio_, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), in which the United States Supreme Court held a defendant's invocation of his or her right to silence should not be used against the defendant at trial. 426 U.S. at 618. "The _Doyle_ rule also applies when the State attempts to impeach a defendant's credibility by arguing that the invocation of his or her right to counsel evidences guilt." _State v. Cosby_, 285 Kan. 230, 245, 169 P.3d 1128 (2007); see also _Doyle_, 426 U.S. at 618; _State v. Edwards_, 264 Kan. 177, Syl. ¶ 8, 955 P.2d 1276 (1998). Under _Doyle_ and its progeny, it has been made clear that the prosecution may not penalize a defendant for invoking _Miranda_ rights during interrogation by using the invocation against him or her at trial. See _Cosby_, 285 Kan. at 245; _People v. Lucero_, 23 Cal. 4th 692, 713, 97 Cal. Rptr. 2d 871, 3 P.3d 248 (2000); _Hardie v. State_, 807 S.W.2d 319, 322 (Tex. Crim. 1991) (evidence of accused invoking right to counsel may improperly be considered as inference of guilt).

Warledo asserts that by allowing the jury to hear his statements regarding counsel, the State sought to infer guilt. In asserting this argument, Warledo presents an argument that he did not raise before the trial court. At trial, Warledo merely raised the question of whether officers had ignored his assertion of his right to counsel; he did not object based upon _Doyle_. Generally, issues not raised before the trial court cannot be raised on appeal. See _State v. Shopteese_, 283 Kan. 331, 339, 153 P.3d 1208 (2007); _State v. Rojas_, 280 Kan. 931, 932, 127 P.3d 247 (2006). A recognized exception to that general rule applies when consideration of the newly asserted claim is necessary to serve the ends of justice or to prevent a denial of fundamental rights. _State v. Moody_, 282 Kan. 181, 192, 144 P.3d 612 (2006); _State v. Williams_, 275 Kan. 284, 288-89, 64 P.3d 353 (2003).

The exception does not apply in this case, however. Rather, the circumstances required an objection. Specifically, the record establishes that both counsel had viewed the video and had agreed

to redact certain portions. The edited video was presented for admission into evidence, and defense counsel requested the video be shown to the jury.

In editing the video, counsel left in Warledo's statement, " 'I need to call a lawyer. Where's my lawyer?' " As a result, under the circumstances of this case, a question arises whether a strategic decision was made to let the jury hear the statement. Such a decision may have been made because the segment arguably supports the defense that Warledo was incapable of forming intent or premeditating the murder. Warledo's statement was made relatively soon after the murder and demonstrated that the momentarily coherent thought process that led to the realization that Warledo should have an attorney was quickly countered by his blurting out incriminating statements as soon as someone entered the interrogation room. This rapid change in behavior and irreconcilable demonstration of intent—asserting the right and then almost immediately giving up the right—evidenced the disorder of Warledo's thought processes and, consequently, may have been something defense counsel wanted the jury to hear.

Moreover, we note that the State did not exploit the assertion of the right to counsel. It made no mention of the situation during arguments and did not ask the jury to consider the assertion as evidence of guilt.

As a result, we cannot say that it serves the ends of justice to consider the issue. Consequently, under the circumstances of this case, the failure to object bars our consideration of the *Doyle* issue.

### 3. *K.S.A. 60-455*

Warledo next contends the trial court erred by admitting evidence in violation of K.S.A. 60-455.

The State filed a pretrial notice of intent to introduce evidence regarding the prior relationship of the parties. More specifically, three categories of evidence are at issue. First, the State sought to admit evidence establishing that 2 days before Squirrel's death, she and Warledo had an argument which resulted in Squirrel's calling 911. Law enforcement officers responded, and Squirrel felt it necessary to leave her residence for the night. The State submitted

evidence of the police report of the incident and of Squirrel's statement to officers that "she had problems with the defendant in the past." The second category related to evidence of a protection from abuse order issued in 2000. Squirrel had filed the action against Warledo. Related to this order, the State sought to present evidence regarding some "surrounding battery cases." Finally, the third category involved a neighbor's testimony testified regarding a few occasions on which he had called officers when Warledo had been drinking because Warledo had been "violent" with other individuals.

At trial, the above evidence was admitted over defense counsel's continuing objection based upon K.S.A. 60-455. Warledo also argued the evidence relating to the 2000 protection from abuse order was too remote in time to be probative and that the prejudicial effect outweighed any probative value. The trial court ruled that all the evidence was admissible to show the "relationship of the parties" and was "very probative and very relevant to prove both intent and premeditation."

Before the admission of evidence of prior conduct, the trial judge gave the following admonition to the jury:

"Let me just instruct you, ladies and gentlemen, ordinarily evidence of other acts or crimes or things, other incidents that occurred are not admissible, particularly if they are shown or offered just to show that the person has a propensity to do the act in question, but on the other hand, they are admissible to show such things as the *relationship between the parties*, and I think . . . this evidence is going to be offered just for that." (Emphasis added.)

Warledo did not request, nor did the trial court give, a limiting instruction at the close of the trial.

Our standard of review was defined in *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). Several steps of analysis were outlined. First, we consider relevancy. 282 Kan. at 47. Warledo does not argue that the evidence was irrelevant, and this portion of the analysis is not disputed.

The next question is whether any rule of evidence required the trial court to exclude the evidence:

"Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district

judge's discretion, depending on the contours of the rule in question. *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004). When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo." *Gunby*, 282 Kan. at 47-48.

On this issue, the rule in question is K.S.A. 60-455, which provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Under the plain language of this statute, application of K.S.A. 60-455 requires determination of whether the evidence relates to a prior crime or civil wrong and, if so, whether it is admitted solely to prove propensity or whether it is relevant to prove some material fact other than propensity. See *Gunby*, 282 Kan. at 48.

Regarding the requirement that the evidence relates to a prior crime or civil wrong, the State contends that the evidence relating to the 911 incident, the previous battery cases, the protection from abuse order, and the neighbor's observations did not qualify as K.S.A. 60-455 evidence. According to the State, the trial court was free, therefore, to admit the evidence without a limiting instruction. To support this argument, the State cites *State v. Anthony*, 282 Kan. 201, 145 P.3d 1 (2006), a premeditated first-degree murder case.

In *Anthony*, we held K.S.A. 60-455 did not apply where the trial court admitted evidence of an eviction notice and a restraining order to show the deterioration in the relationship between the defendant and the victim. We stated that we did not "believe either the eviction or the restraining order qualify as evidence of other crimes or civil wrongs committed by Anthony." 282 Kan. at 214. And although they were effected through civil court procedures, the "wrongs" giving rise to them, if any, were not the types of behavior that would demonstrate propensity to commit the crime

at issue. Thus, no limiting instruction was necessary because K.S.A. 60-455 was inapplicable. 282 Kan. at 214.

As in *Anthony*, the existence of a restraining order or a protection from abuse order may not of itself fit the statutory qualifications. Unlike *Anthony*, however, the acts giving rise to the order were criminal acts. Additionally, the behaviors could be viewed by a jury as evidence which demonstrated a propensity to commit crimes of violence. Some of the evidence would indicate a propensity to be violent with his mother, other evidence would show a propensity toward violence when he was drunk. In the present case, unlike *Anthony*, the conduct which led to prior law enforcement contacts and which was testified to by the neighbor constituted crimes or civil wrongs.

This leaves the question of whether the evidence was probative of a material fact other than propensity. At the time of Warledo's trial, evidence was admissible independent of K.S.A. 60-455 for the purpose of showing the relationship of the parties and did not require a limiting instruction. See, *e.g.*, *State v. Deal*, 271 Kan. 483, 502, 23 P.3d 840 (2001); *State v. Carr*, 265 Kan. 608, 624, 963 P.2d 421 (1998). In *Gunby*, 282 Kan. at 57, this court explicitly abolished this exception, holding that the admission of all evidence of other crimes and civil wrongs must be analyzed under K.S.A. 60-455. Hence, to the extent the trial court reasoned the evidence of the 911 incident, the previous battery cases, and the protection from abuse order were admissible to show the relationship between Warledo and his mother, such rationale was improper.

The trial court cited alternative bases for admission of the evidence, stating it was "very probative and very relevant to prove both intent and premeditation." We need not analyze the appropriateness of these alternative bases, however, because the instruction to the jury was limited to the relationship of the parties. In *Gunby*, we reiterated that the limiting instruction is given as a safeguard against the jury improperly considering the evidence for a reason not permitted, particularly to establish propensity. 282 Kan. at 48. Additionally, in *Gunby*, we determined that the failure to instruct on the basis of the evidence's admission would be

deemed error, although not necessarily reversible error. 282 Kan. at 57.

We must, therefore, consider whether the error was harmless. The harmless error rule is stated in K.S.A. 60-261:

> "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

See *State v. Woolverton*, 284 Kan. 59, 65-66, 159 P.3d 985 (2007).

Applying this rule to the erroneous admission of K.S.A. 60-455 evidence in *State v. Hebert*, 277 Kan. 61, 94, 82 P.3d 470 (2004), this court addressed whether the admission of the evidence (1) was inconsistent with substantial justice; (2) affected the substantial rights of the defendant; and (3) had any likelihood of changing the results at trial. See *State v. Gonzalez*, 282 Kan. 73, 99-100, 145 P.3d 18 (2006).

In this case, none of these considerations applies. The jury heard the 911 recording on which Warledo was stomping his mother to death. It heard his confessions on the law enforcement interrogation video. Warledo's version of events and eagerness to tell officers what he had done was corroborated by several witnesses. In other words, the weight of the evidence that Warledo committed the crimes is overwhelming. In addition, the argument that the jury might infer a propensity to commit criminal acts from the evidence of the other crimes and civil wrongs is particularly weak considering that Warledo at trial did not argue he had not committed the murder. See *Gonzalez*, 282 Kan. at 100.

The issue which was disputed was whether Warledo possessed the requisite intent to justify a conviction for first-degree murder. The impact of the prior crimes evidence on this issue was not such as would affect substantial rights. Keeping in mind that K.S.A. 60-455 is aimed at excluding evidence that is aimed only at propensity, any propensity which would be indicated from the prior crimes evidence would suggest that, consistent with Dr. Albott's opinion,

Warledo acted in response to the threat he perceived was posed by his mother.

Moreover, the evidence of intent and premeditation was strong. The audio recording of the 911 call revealed breaks in the stomping after which Warledo would resume his battering of his mother. He repeatedly indicated that she was not going to live. At one point, Warledo yelled, " 'Die, die, die,' " and then began stomping again.

We, therefore, conclude that because Warledo's conviction did not turn on whether he committed the prior acts and because of the overwhelming evidence of his guilt, the admission of evidence regarding prior crimes or civil wrongs was not inconsistent with substantial justice, did not affect Warledo's substantial rights, and had no likelihood of changing the results at trial. The erroneous admission of K.S.A. 60-455 evidence was harmless.

### 4. Photographs

Next, Warledo claims the trial court erred when it admitted certain photographs of the victim over defense counsel's objection. Seven photographs depicted the victim at the scene of the murder, and one photograph was a closeup of the victim's face during the autopsy.

The photographs at the scene showed the victim lying on the kitchen floor, beaten and bloody, with her face, chest, and left arm charred. They also depicted blood spatter in the surrounding area and on objects in the room. These seven photographs were admitted during the State's direct examination of Officer Brandon Gourley and Investigator Higday and were used by those two witnesses to describe the scene as they found it on the night of the murder. The State's questions focused on the scene surrounding the body, such as the blood spatter, the layout of the kitchen and the house, and the location of the BIC lighter found on the floor.

The one autopsy photograph was admitted during the State's direct examination of the forensic pathologist. It depicted a closeup profile view of the victim's face and showed the markings consistent with the sole of a shoe. These markings served as one basis for the expert's opinion that the cause of death was blunt force trauma to the victim's head and neck.

In reviewing Warledo's arguments, we apply an abuse of discretion standard. *State v. Bryant*, 285 Kan. 970, Syl. ¶ 7, 179 P.3d 1122 (2008) (admission of photographs in homicide case is within trial court's discretion); *State v. Torres*, 280 Kan. 309, 327, 121 P.3d 429 (2005) (same). To determine whether the trial court abused its discretion in admitting the photographs, two questions must be resolved: (1) Were the photographs relevant, and (2) if the photographs were relevant, did the prejudicial nature of the photographs substantially outweigh their probative value? *State v. Miller*, 284 Kan. 682, 696, 163 P.3d 267 (2007); see *State v. Sappington*, 285 Kan. 176, 194, 169 P.3d 1107 (2007); *State v. Kirby*, 272 Kan. 1170, 1186-88, 39 P.3d 1 (2002); *State v. Ruebke*, 240 Kan. 493, 517, 731 P.2d 842 (1987) (photographs and videotape of homicide victims had "reasonable tendency to prove or disprove a material fact in issue, or shed light upon a material fact").

Regarding relevance, this court has reiterated that " " "[p]hotographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a murder case." ' " *State v. Adams*, 280 Kan. 494, 510, 124 P.3d 19 (2005) (quoting *State v. Green*, 274 Kan. 145, 147, 48 P.3d 1276 [2002]). In addition, despite their sometimes gruesome nature, " 'photographs which aid a pathologist in explaining the cause of death are admissible.' [Citation omitted.]" *State v. Cavaness*, 278 Kan. 469, 477, 101 P.3d 717 (2004). Nevertheless, this court has also held that the admission of such photographs is error when the photographs do not help explain or supplement testimony, but rather serve to "inflame the minds of the members of the jury." *State v. Boyd*, 216 Kan. 373, 377, 532 P.2d 1064 (1975).

Here, Warledo contends the cause and means of death were not contested at trial and, therefore, the pictures were not necessary. While we recognize the cause and means of death were not at issue in this case, still, the photographs were relevant. The photographs gave the jury an understanding of the size of the living space in which the events transpired, gave context to the diagram and descriptions of the layout presented in court, and showed the position of the victim. See *State v. Bell*, 273 Kan. 49, 53, 41 P.3d 783 (2002) (Photographs used to prove manner of death and violent nature of

crime are relevant and admissible.); *Deal*, 271 Kan. at 493 (Photographs which are relevant and material in assisting jury's understanding of medical testimony are admissible, including photographs which aid pathologist in explaining cause of death.). More importantly, the blood spatter helped illustrate the violence with which Warledo acted, a fact that weighed in the determination that he acted with an intent to kill. We also note that the State has the burden to prove all the elements of the crime charged and "photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible" even if the cause of death is not contested. *Sappington*, 285 Kan. at 195 (citing *State v. Gholston*, 272 Kan. 601, 613, 35 P.3d 868 [2001], *cert. denied* 536 U.S. 963 [2002]).

After examining the photographs, we also see no abuse of discretion in the trial court's weighing of the photographs' probative value and potential for undue prejudice. It is true that "[g]ruesome crimes result in gruesome photographs." *Green*, 274 Kan. at 148. But, there is no showing that the photographs distorted the reality. Nor is there any showing that the photographs were admitted for the sole purpose of inflaming the passion of the jurors. See *State v. Carter*, 284 Kan. 312, 329-30, 160 P.3d 457 (2007); *State v. James*, 279 Kan. 354, 357-58, 109 P.3d 1171 (2005). Finally, the photographs are not too repetitious or cumulative because they show the victim and the scene at various angles and, while present in the photographs, the victim is not always the focus.

### 5. *Closing Argument*

Warledo also claims that the prosecutor committed reversible misconduct during closing argument by misstating the law regarding premeditation. He cites as improper the following comments by the prosecutor:

"Premeditation, ladies and gentlemen, is the opportunity to reflect on what he's doing. It's every opportunity that he had in this case to think about what he's doing as he's dropping his foot down on his mother's head numerous times. Doesn't mean to be present even before the fight started.

"Premeditation doesn't need to be present before that fight started when he went over to make his sandwich. It doesn't need to be planned beforehand, and you can look at his conduct, what is his conduct all the way up after, what he's

doing after the murder took place. Threats and statements before and during the occurrence can be considered and lethal blows after the victim is rendered helpless in this case.

"Premeditation can be formed between the first and second stomps, between the second and third stomps, at any point during the stomping (attorney stomping). Okay. The stomping, what is his desire? To kill his mother. Ultimately it boils down to what's going on in the defendant's brain when he's stomping his mother to death. 15 stomps."

And on rebuttal, the prosecutor stated:

"What we're saying is as he stomped, as he knocked her down, he had time to think. As he kicked her in the head, he had time to think. As he stomped on her, he had time to think. Again, time to think and again, time to think and if that's not enough, ladies and gentlemen, you hear him on the tape walk away and then come back (attorney stomping) in between saying things. Again he stomped. He came back and then stomped again. Do you think he had time enough to think?"

Warledo did not object at any time to the prosecutor's statements during closing argument. But when a defendant's claim for prosecutorial misconduct implicates his or her right to a fair trial, we review the alleged misconduct under the same analysis, regardless of whether an objection was made. *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006).

When evaluating a prosecutorial misconduct claim, the appellate court first asks whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence. *State v. Cosby*, 285 Kan. 230, 246, 169 P.3d 1128 (2007); *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004). A prosecutor "is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. [Citation omitted.]" *State v. Scott*, 271 Kan. 103, 114, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001). Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *Swinney*, 280 Kan. at 779. In its plain error analysis, the appellate court considers three factors:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually control-

ling. Moreover, the third factor may not override the first two factors, unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman* [*v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967) (conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial)], have been met. [Citations omitted.]" *Swinney*, 280 Kan. at 780.

When a defendant claims that a prosecutor committed reversible misconduct, the prejudicial nature of alleged errors is analyzed in the context of the trial record as a whole. *Miller*, 284 Kan. at 716.

Warledo contends that the prosecutor misstated the law when he told the jury that premeditation is an opportunity to *reflect* on one's actions and that premeditation need not be present *before* the killing begins. Further, the prosecutor said that premeditation can occur *during* the murder, which Warledo argues is merely another way of inappropriately stating that premeditation can occur "instantaneously."

We have on several occasions disapproved arguments that suggested that premeditation can be instantaneous. See *State v. Morton*, 277 Kan. 575, 583-85, 86 P.3d 535 (2004) (prosecutor gestured as though firing a gun, stating: "That can be premeditation under the laws of the State of Kansas. One squeeze of a trigger is all it takes"; reversible misconduct); *State v. Doyle*, 272 Kan. 1157, 1163, 38 P.3d 350 (2002) (error for prosecutor to say: "something can be premeditated as soon as it happens"). Rather than be instantaneous, there must be some thought beforehand. PIK Crim. 3d 56.04(b). There is, however, no specific length of time defined for premeditation. See *Morton*, 277 Kan. at 584.

The prosecutor's comments in this case are somewhat reminiscent of those in *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006), a case involving the death of the victim by prolonged strangulation. In *Gunby*, several of the prosecutor's statements were troubling:

"(1) '[P]remeditation can occur after the chain of events,' (2) '[A]t some point after he started hitting and strangling her . . . [the defendant] made the conscious decision, "I want to kill you" . . . [and] that's when he premeditate[d],' (3) A defendant 'cannot intentionally strangle somebody to death without there being premeditation,' and (4) It is 'impossible to intentionally strangle somebody to death without knowing, thinking and wanting that person to die [and] that is

all that is required for premeditation . . . that is the premeditation.' " 282 Kan. at 64.

This court observed that the prosecutor's comments defined premeditation somewhere "between the level of forethought outlined in the PIK instruction we have endorsed, [citation omitted], and the 'instantaneous' timing we have disapproved. [Citations omitted.]" 282 Kan. at 64. We discussed *Scott*, 271 Kan. at 108, where it was stated that premeditation is "the process of thinking about a proposed killing before engaging in the homicidal conduct," but premeditation "does not have to be present before a fight, quarrel, or struggle begins." Further, premeditation is "the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived, or schemed beforehand." *Gunby*, 282 Kan. at 64 (citing *Scott*, 271 Kan. at 108-09).

Also, the *Gunby* court noted that in *State v. Jones*, 279 Kan. 395, 404, 109 P.3d 1158 (2005), where the victim was manually strangled, this court reaffirmed *Scott*'s holding that a jury can find a defendant's state of mind changed from mere intent to premeditation at any time during the violent episode that ultimately caused the victim's death, including at any time during a strangulation. *Gunby*, 282 Kan. at 65; see *State v. Moncla*, 262 Kan. 58, 73, 936 P.2d 727 (1997) (18 hammer strikes to the head sufficient to show premeditation and deliberation); *State v. Phillips*, 252 Kan. 937, 939-40, 850 P.2d 877 (1993) (continual stomping and kicking resulting in death sufficient to support premeditation); *State v. Brown*, 234 Kan. 969, 972-73, 676 P.2d 757 (1984) (struggle, beating, and prolonged strangulation sufficient to show premeditation).

Reflecting on those cases, *Gunby* found the prosecutor's statements were "barely outside" the broad latitude permitted in discussing the evidence, but this court found any error was harmless. Based on the facts in *Gunby*, the prosecution's comments were not gross and flagrant, and the evidence against the defendant was direct and overwhelming. In addition, when the jury sought further guidance on premeditation from the judge during deliberations, he properly directed them back to the PIK instruction. Consequently, this court concluded both the harmlessness tests of K.S.A. 60-261

and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967), were met. *Gunby*, 282 Kan. at 65; see *Tosh*, 278 Kan. at 97-98.

More recently, this court has stated a prosecutor may properly point out that the number and order of blows could have given the defendant "an opportunity to think about what he or she was doing" and that "infliction of additional blows after the first blows" which rendered the victim helpless could evidence premeditation. *State v. Anthony*, 282 Kan. 201, 209, 145 P.3d 1 (2006). Such comments are consistent with the PIK instruction and Kansas precedent. See, *e.g.*, *State v. Pabst*, 273 Kan. 658, 661, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002) (No error for prosecutor to say premeditation "means to have thought the matter over beforehand. It's the conscious act of a person.").

The prosecutor's statements in this case are more along the lines of arguments we approved in *Anthony* and other cases and, under the circumstances of this case, were consistent with the evidence. In context, the closing argument informed the jury that Warledo need not have developed a plan or scheme before the fight started. But, once the fight had started, he could have formed an intent and developed a plan to commit murder. The audio recording provides evidence that this is what occurred. There were 19 blows delivered as Warledo yelled his intent that his mother would die. In fact, the audio recording suggests breaks in the stomping, which were of sufficient duration to have allowed Warledo to think about his action before engaging in homicidal conduct.

Even if we view the prosecutor's comments outside of this context and consider them, like the comments in *Gunby*, to fall just outside the broad latitude permitted in discussing the evidence, any error was harmless. Based on the facts, the comments were not gross and flagrant; there appears to be no ill will on the part of the prosecutor. Moreover, the evidence against Warledo was direct and overwhelming. As in *Gunby*, both the harmlessness tests of K.S.A. 60-261 and *Chapman*, 386 U.S. 18, are met, and no reversible prosecutorial misconduct occurred under the facts in this case.

## 6. *Identical Offense Sentencing Doctrine*

Warledo next argues that despite his conviction for premeditated first-degree murder, the identical offense sentencing doctrine mandates that he receive a lesser sentence commensurate to an intentional second-degree murder conviction. He contends that if the prosecutor's closing comments are held to be "correct statements of law," then there is no "appreciable difference" between the two types of murder; therefore, only the lesser penalty should apply.

It is well established that offenses are identical when they have the same elements. *State v. Cooper*, 285 Kan. 964, 966, 179 P.3d 439 (2008); *State v. Fanning*, 281 Kan. 1176, 1180, 135 P.3d 1067 (2006). In order to determine whether the elements are identical for sentencing purposes, an appellate court must consider the statutory elements and that review is unlimited. *Cooper*, 285 Kan. at 966.

Comparing premeditated first-degree murder and intentional second-degree murder leads to the conclusion these crimes are clearly not identical. Premeditated first-degree murder is defined under K.S.A. 21-3401(a) as "the killing of a human being committed . . . [i]ntentionally and with premeditation." The difference between premeditated first-degree murder and intentional second-degree murder is that premeditated first-degree murder includes the element of premeditation. K.S.A. 21-3401(a); K.S.A. 21-3402(a). We also note that second-degree intentional murder is a lesser included offense of premeditated first-degree murder because all the elements of second-degree murder are identical to some of the elements of first-degree murder. K.S.A. 21-3107(2)(b).

Warledo's argument regarding the identical offense sentencing doctrine has no merit.

## 7. *Weighing Factors for Hard 50 Sentence*

Warledo next challenges the trial court's finding under K.S.A. 21-4636(f) that the murder was committed in an especially heinous, atrocious, or cruel manner. Although he presents this issue as a sufficiency of the evidence question, Warledo does not actually dispute the sentencing court's findings regarding the aggravating

circumstance. Instead, he argues that the sentencing court should have given more weight to the mitigating circumstances presented by the defense.

Our standard of review on the sentencing court's weighing of aggravating and mitigating circumstances is abuse of discretion. *State v. Lawrence*, 281 Kan. 1081, Syl. ¶ 3, 135 P.3d 1211 (2006); *State v. Robertson*, 279 Kan. 291, 308, 109 P.3d 1174 (2005).

As in the present case, when a defendant is convicted of premeditated first-degree murder, Kansas law provides that the sentencing court shall determine whether the defendant shall be required to serve a mandatory term of imprisonment of 50 years without eligibility for parole. K.S.A. 21-4635(b); K.S.A. 21-4638. The court is required to make the hard 50 determination after considering evidence of aggravating and mitigating circumstances. K.S.A. 21-4635(c). If the sentencing court finds that one or more of the aggravating circumstances enumerated in K.S.A. 21-4636 exist and that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances, the defendant shall receive the hard 50 sentence. K.S.A. 21-4635(d).

Here, the sentencing court found that one aggravating circumstance existed—the defendant committed the crime in an especially heinous, atrocious, or cruel manner. K.S.A. 21-4636(f). As a basis for the aggravating circumstance, the court found (1) there was infliction of mental anguish or physical abuse before the victim's death, (2) there were continuous acts of violence before and continuing after the killing, and (3) there was the desecration of the victim's body in a manner indicating a particular depravity of mind. K.S.A. 21-4636(f)(3), (5) and (6). Again, Warledo does not raise any arguments disputing these findings.

At sentencing, Warledo asserted two statutory mitigating circumstances. First, he argued that he was under the influence of extreme mental and emotional disturbances at the time of the incident. K.S.A. 21-4637(b). Second, Warledo contended his capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of the law was substantially impaired because of his mental condition at the time of the incident. K.S.A.

21-4637(f). Warledo essentially contends that his claimed mental defect outweighed any other factors.

The sentencing judge found that the mitigating circumstances alleged by Warledo existed, but he also found that the State proved the existence of the aggravating circumstance. The judge described his weighing of the aggravating and mitigating circumstances:

"[I]t is recognized . . . that one aggravating circumstance[] could be so compelling as to outweigh several mitigating circumstances and vice versa.

"In this case, I have no question that there [were] some mitigating circumstances. I think there was mental or emotional disturbance that existed. To say that they were extreme, I'm not certain I have the capacity to measure other than to recognize that they exist.

"It is a mitigating factor that the capacity of the defendant to appreciate the criminality of his conduct at the moment in time was substantially impaired. And then weighed against that are the actual facts of the crime. It admittedly, even [defense counsel] has acknowledged, it was a very brutal case. No question, the body was set on fire. There is no question about that.

"Based on my weighing of these facts and circumstances, and the criteria of the statute, I do find that the defendant committed the crime in an especially heinous, atrocious or cruel manner by the infliction of mental anguish or physical abuse before the victim's death [and] by the continuous acts of violence begun before or continuing after the killing, that being the continual stomping.

"And certainly the desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing.

"And I find that these aggravating circumstances are not outweighed by the mitigating circumstances, and accordingly the court will impose the life sentence with the Hard 50 requirement."

Warledo argues that the sentencing court failed to carefully consider the mitigating evidence and, instead, improperly chose only to focus on the evidence supporting the aggravating circumstance. But the sentencing court's comments clearly show that the court did properly consider and weigh the defendant's mitigators. The court simply found that the State's aggravating circumstance outweighed the defendant's mitigating circumstances.

It is well established that " '[w]eighing aggravating and mitigating circumstances is not a numbers game. "One aggravating circumstance can be so compelling as to outweigh several mitigating circumstances" ' and vice versa." *State v. Engelhardt*, 280 Kan. 113,

144, 119 P.3d 1148 (2005). Warledo has failed to establish an abuse of discretion.

### 8. *Constitutionality*

Warledo contends that the hard 50 sentencing scheme is unconstitutional because it permits the sentencing court to find facts that enhance the available sentencing range, utilizing a preponderance of the evidence standard, in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999).

This court found the predecessor statute, the hard 40 sentencing scheme, constitutional in *State v. Conley*, 270 Kan. 18, 35-36, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). We have consistently rejected similar arguments regarding the hard 50 scheme and have declined to overrule *Conley*. See, *e.g.*, *Lawrence*, 281 Kan. at 1096; *State v. Buehler-May*, 279 Kan. 371, 386, 110 P.3d 425, *cert. denied* 546 U.S. 980 (2005); *State v. James*, 279 Kan. 354, 358, 109 P.3d 1171 (2005); *Robertson*, 279 Kan. at 308; *State v. Hurt*, 278 Kan. 676, 686-88, 101 P.3d 1249 (2004).

We have not altered this view even as the United States Supreme Court has decided cases subsequent to *Apprendi* relating to the question of judicial fact finding during the sentencing phase. Regarding these cases, in *State v. Johnson*, 284 Kan. 18, 159 P.3d 161, *cert. denied* 552 U.S. 161 (2007), we observed that the Supreme Court continues to invalidate judicial preponderance of the evidence fact-finding that exposes a defendant to a sentence in excess of the statutory *maximum* as being a violation of a defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments to the United States Constitution. 284 Kan. at 22-23 (citing *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 [2007]). Yet, the Court has not altered decisions in which it recognized that the prohibition does not apply when considering the *minimum* sentence to be imposed. See *McMillan v. Pennsylvania*, 477 U.S. 79, 83-86, 91 L. Ed. 2d 67, 106 S. Ct. 2411 (1986) (court may find, by preponderance of evidence, a fact that increases minimum penalty for a crime); see also *Harris v. United*

*States*, 536 U.S. 545, 558, 153 L. Ed. 2d 524, 122 S. Ct. 2406 (2002) ("Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.").

In determining whether to impose a hard 50 sentence, the sentencing court is considering the minimum sentence, not the maximum. The maximum sentence for first-degree murder is life in prison. See K.S.A. 21-4638; K.S.A. 21-4706(c). The hard 50 sentence enhances the minimum sentence which must be served and does not expose a defendant to a higher maximum sentence than provided by statute. Under current law, our hard 50 sentencing scheme is constitutional. *Johnson*, 284 Kan. at 23.

### 9. *Cumulative Error*

Finally, Warledo claims that even if the errors he alleges on appeal do not individually require this court to reverse his conviction, the cumulation of the alleged errors denied him a fair trial. "Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction." *State v. Ackward*, 281 Kan. 2, 29, 128 P.3d 382 (2006).

The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative effect rule if the evidence is overwhelming against the defendant. *State v. Nguyen*, 285 Kan. 418, 437, 172 P.3d 1165 (2007); *Ackward*, 281 Kan. at 29.

We are satisfied that Warledo received a fundamentally fair trial.

Affirmed.

JOHNSON, J., concurring: I concur with the majority's result but write separately to confess that I am confused about how this court distinguishes between premeditated first-degree murder and intentional second-degree murder. Further, I am concerned about how we allow prosecutors to explain the difference to the jury.

In rejecting the defendant's creative argument that premeditated first-degree murder and intentional second-degree murder

have the same elements, the majority correctly points out that, on paper at least, the first-degree crime has the added element of premeditation. See K.S.A. 21-3401(a); K.S.A. 21-3402(a). Both are intentional murders, requiring the killer to form the intent to kill, prior to committing the act which causes death. Additionally, to be a premeditated murder, the killer must have "thought the matter over beforehand" so that the act is "more than the instantaneous, intentional act of taking another's life." See PIK Crim. 3d 56.04(b).

What I cannot grasp is the concept that one can have thought the matter over beforehand, when the intent to kill is formed during the course of committing the murderous act, *e.g.* while strangling or stomping the victim. In other words, in my mind, "beforehand" means prior to commencing the death-causing act, rather than during said act but sometime prior to its effecting the death. If we merge the concept that the killer must have thought over the matter beforehand, as in premeditated first-degree murder, with the concept that a killer must have formed the intent to kill prior to the victim's death, as in intentional second-degree murder, we have rendered the premeditation element redundant and opened the door to defendant's same elements argument.

Accordingly, I view portions of the closing argument to have been an incorrect statement of the law, especially where the prosecutor argued that premeditation could be formed "between the first and second stomps, between the second and third stomps, at any point during the stomping." Nevertheless, the facts of this case presented something more than a continuous attack culminating in death. The 911 tapes suggest that Warledo's initial attack, presumably prompted by his mother's verbal and physical confrontation, ceased for a time and that the victim was still alive. I would find it temporally permissible for the jury to find that, during the respite, Warledo thought over the matter of killing his mother and formed that intent prior to recommencing the attack. Moreover, I am convinced that, even without the offending closing argument, the jury would have reached the same result.