No. 93,766

STATE OF KANSAS, *Appellee*, v. KELLY JAY LAWRENCE, *Appellant*.

(135 P.3d 1211)

Opinion filed June 9, 2006.

*Michelle Davis*, assistant appellate defender, argued the cause and was on the brief for appellant.

*Sean Baker*, assistant district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion was delivered by

LUCKERT, J.: Kelly Jay Lawrence appeals his convictions for first-degree premeditated murder, aggravated battery, two counts of aggravated assault, and possession of a firearm. He argues the trial court erred in (1) excluding evidence of a prior shooting in which the defendant was the victim and (2) not instructing the jury to deliberate premeditation and imperfect self-defense at the same time. He also appeals from the trial court's imposition of a hard 50 life sentence, arguing the sentencing judge failed to properly consider mitigating evidence and that the sentencing provision is unconstitutional. We reject his arguments and affirm his convictions and sentences.

## FACTS

On December 1, 2001, Willie Adams, Michael Smith, Benjamin Riley, and Dontue Trevillion went to Holt's barbershop in Wyandotte County, Kansas. Ben stayed to get his hair cut while the three others left to get something to eat. As Willie was backing his car out of its parking space, he came close to another car and, according to some witnesses, the loud music in Willie's car set off the other car's alarm. Ravaughn Lawrence and his wife, Mia, claimed that Willie hit and scratched Ravaughn's car. Willie and Ravaughn argued; Ravaughn pushed Willie, and Willie pointed his index finger at Ravaughn's forehead and threatened to beat him up. James Holt came out of the barbershop and broke up the dispute. Michael and Dontue convinced Willie to get back in the car and leave.

Ben saw the altercation through the barbershop window. When Ravaughn came back inside the barbershop, Ben observed him using the telephone and heard him say, "Call Kelly." Ravaughn admitted making a call but denied saying, "Call Kelly."

After getting something to eat, Willie, Michael, and Dontue returned to Holt's barbershop and went inside. Willie and Ravaughn began arguing again and Holt told them to take it outside. When Willie, Michael, and Dontue went outside, Damon Mondaine, whom Willie had called on his cell phone when the first altercation occurred, was there. A few minutes later, a black car pulled up and the defendant, Kelly Lawrence, got out. The defendant is Ra-

vaughn's younger brother. By that time, Willie and Ravaughn were arguing again in a loud and angry manner. Michael tried to convince Willie to leave and Damon tried to calm Willie down. All indicated they were ready to leave and headed to Willie's car when, according to some witnesses, the defendant said, "There ain't nobody going nowhere," and pulled out a gun and started shooting.

As Michael turned to run, he was shot in the stomach; Michael survived. Willie was killed by a gunshot wound that entered his back, damaged his heart and lungs, and exited the front of his body. One bullet came through the barbershop window but did not injure anyone.

Michael, Dontue, and Damon all testified that they did not see anyone in possession of a gun that day other than the defendant. Nor did any of them hear Willie threaten to shoot anyone.

The defendant and his witnesses presented a different view of the events. The defendant admitted shooting the victims but claimed he was acting in defense of himself and others. The defendant testified that, on the day of the shooting, he was riding with his brother Ravaughn's wife, Mia, when they went to the barbershop to take Ravaughn his car keys. Damon Mondaine, whom the defendant knew, called the defendant out of the car. Damon did not know it was the defendant's brother inside the barbershop, and he told the defendant, "[W]hen this dude come out, we gonna fuck this nigger up." The defendant told Damon that "the dude with that car who he pointed at was my brother." Willie was also outside. When the defendant asked Willie to let it go, Willie responded, "[F]uck that nigga."

When Ravaughn came out of the barbershop, he and Willie began arguing. According to the defendant, Willie said, "I'll kill you, nigga," and, "I have something for all of ya'll." The defendant saw Willie go to his car, reach down, and come up with a pistol. At that point, the defendant "turned around, ran and shot." After shooting at Willie, the defendant saw Michael running towards him with a handgun. Michael fired a few shots at the defendant, and the defendant fired back once.

The defendant testified that Willie had a reputation for fighting and for carrying a firearm. The defendant was scared and believed

that he, his brother, and his brother's wife were all at risk. The defendant explained he carried a gun because he had been shot and nearly died 5 months earlier and, although the man who shot the defendant was in jail, other people had been trying to convince the defendant not to testify. The defendant testified that he was not called to the barbershop or told to bring a firearm.

Ravaughn and Mia also testified on behalf of the defendant and generally corroborated his version of events. Ravaughn, Mia, and a third defense witness, David Hill, all testified that Willie had threatened to "pop" or shoot Ravaughn during the altercation about the scratched car.

After the shooting, police officers processed Willie's car, the barbershop, and the scene. They recovered no guns or ammunition. They did find four 9 mm caliber shell casings which had been fired from the same gun. Willie Adams' fatal gunshot wound was consistent with his having been shot by a 9 mm. A bullet hole found in Ravaughn's car and a bullet fragment recovered at the scene were consistent with a 9 mm caliber but could also have been from a higher caliber weapon.

A jury convicted the defendant of first-degree premeditated murder, aggravated battery, two counts of aggravated assault, and possession of a firearm. The trial court sentenced the defendant to a hard 50 life sentence for the murder conviction with all other sentences running concurrently. The district court granted the defendant's request to file a notice of appeal out of time. This court's jurisdiction is pursuant to K.S.A. 22-3601(b)(1) (off-grid crime).

## EVIDENCE OF PRIOR SHOOTING

The defendant's first argument on appeal is that the trial court violated his constitutional right to present his theory of defense by limiting the introduction of evidence regarding the prior shooting in which the defendant was the victim. The defendant contends that he wished to present this evidence to establish his subjective state of mind and to show that he had an honest, if unreasonable, belief that the circumstances justified deadly force. Under this imperfect self-defense theory, the defendant would have been guilty of voluntary manslaughter under K.S.A. 21-3403(b).

Under the state and federal Constitutions, a defendant is entitled to present his or her theory of defense. *State v. Lackey*, 280 Kan. 190, 216, 120 P.3d 332 (2005). "However, the right to present a defense is subject to statutory rules and case law interpretations of the rules of evidence and procedure. [Citation omitted.]" *Lackey*, 280 Kan. at 216. Thus, a defendant's fundamental right to a fair trial is violated only when the trial court excludes relevant, admissible, and noncumulative evidence that is an integral part of the defense theory. *State v. Patton*, 280 Kan. 146, 156, 120 P.3d 760 (2005).

The evidence regarding the prior shooting was first discussed by the attorneys and the trial court after jury selection. The State noted that defense counsel "mentioned during voir dire that the defendant had been shot before" and requested that evidence about the shooting be limited. Defense counsel explained that, 5 months before the charged incident, the defendant had been struck by a stray bullet when the shooter, Damon Mondaine's roommate, was involved in a confrontation with police. The trial court ruled that evidence of the prior shooting would be admissible as relevant to the defendant's state of mind or "why he was the way he was on the date in question without any more details." The court explained, "You can get into the fact that he was shot, but you cannot intimate that these folks were the ones that shot him."

Consistent with this ruling, evidence regarding the shooting was admitted. Defense counsel asked Damon Mondaine whether he knew that the defendant had been shot several months earlier, and Damon responded, "Yes." Defense counsel also asked Detective Zeigler whether he had investigated a shooting where the defendant was the victim, and the detective responded, "Yes." The State then objected to any further questions about the prior shooting, and the trial court sustained the objection. Defense counsel made no complaint and did not indicate that she wished to ask the detective any further questions about the shooting. During redirect and recross-examination, counsel clarified with the detective that the prior shooting was charged as an aggravated battery rather than an attempted homicide and that the detective was aware that the defendant had been shot during the incident. Also, the defendant's

brother Ravaughn testified about the prior shooting of the defend-
ant and the extent of the defendant's injuries, stating that the de-
fendant had been "in real bad shape" after "[t]he bullet went
through his arm, both his lungs and his esophagus and pierced his
heart."

Additionally, the defendant himself testified about the prior
shooting, explaining that he carried a gun after the shooting and
that is why he had a gun at the barbershop. The trial court did not
limit the defendant's testimony regarding the prior shooting. De-
spite there being no limitation on his testimony, the defendant
never connected the two events beyond explaining why he carried
a gun. He testified he was scared that he, his brother, and his
brother's wife were at risk at the barbershop, but he did not tie
this feeling to the prior shooting. Nor did he suggest that the events
at the barbershop were in any way related to the prior shooting.
On cross-examination, the State asked the defendant about the
date, time, and location of the prior shooting. Defense counsel then
argued the State had "opened the door to anything about that
event," but the trial court disagreed.

At oral argument, appellate counsel argued that, based on the
trial court's rulings, defense counsel at trial did not "think she could
go there" in further questioning the defendant about the relation-
ship between his perceptions and his experience and asking wit-
nesses for more details regarding the randomness of the shooting.
This argument is belied by the record. Not only did defense coun-
sel ask defendant about the prior shooting in order to elicit his
testimony about why he was carrying a gun, with no objection by
the State, but the trial court made clear in its pretrial ruling that
it would allow evidence of the prior shooting to explain "why [the
defendant] was the way he was on the date in question."

The record reflects that the defendant was allowed to present
considerable evidence about the prior shooting and the trial court
did not prevent the defendant from presenting his theory of de-
fense, allowing the defendant to establish "why he was the way he
was on the date in question." From the evidence presented, the
defendant could argue and the jury could easily reach its own com-

mon sense conclusions about the effect the prior, recent shooting might have had on the defendant.

The trial court did foreclose the defendant's attempt to elicit expert testimony regarding the effect of the shooting on the defendant's state of mind. This issue first arose when the State called Dr. Michael Monkure to testify about his treatment of Michael Smith's gunshot wound. When Dr. Monkure took the stand, the defendant recognized the doctor as his treating physician in the prior shooting incident. On cross-examination defense counsel attempted to question Dr. Monkure about gunshot wounds being a "viable threat" in inner city African-American communities and "whether or not my client's state of mind would have been whether he thought that that was a realistic threat." The State objected on grounds of relevance and the doctor's lack of qualifications to give an opinion on inner city African-American communities. The trial court ruled that defense counsel could ask only about the doctor's experience with gunshot wounds, not about whether gunshot wounds were a viable risk in inner cities or the defendant's state of mind.

Before cross-examining Dr. Monkure, defense counsel also indicated she planned to subpoena the doctor to testify for the defense regarding the defendant's state of mind, proffering the doctor's statement to the defendant that it had been a miracle that he had lived. The trial court indicated the defense was free to subpoena the doctor but should also discuss with the doctor "what he's allowed to testify to or not. We'll have to talk about that beforehand."

At the close of the defendant's case, defense counsel informed the trial court that she wished to call Dr. Monkure "to offer expert testimony as to the reasons and motives for acting as [the defendant] did." The prosecutor argued that because Dr. Monkure was not a psychologist or psychiatrist he was not qualified to comment as to the defendant's state of mind. Second, the prosecutor argued that the proper foundation for such expert testimony had not been laid because the defendant had testified but never claimed that the prior shooting affected the way he thought or acted during the charged incident, only that it had prompted him to carry a gun.

The trial court agreed and overruled defense counsel's request to call Dr. Monkure as a witness.

K.S.A. 60-456 governs the admission of opinion testimony. Under the provisions of K.S.A. 60-456(b), admissible expert opinions are limited to those "(1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." The proponent of expert opinion testimony must lay the foundation to establish these requirements. See *Welch v. State*, 270 Kan. 229, 235, 13 P.3d 882 (2000). In this case, there was no foundation laid or proffer made that Dr. Monkure had the special knowledge, skill, experience, or training to qualify as an expert about the frequency of gunshot wounds in inner cities. This question went beyond asking about the physician's own experience with gunshots. Additionally, although defense counsel did not refer to the term post-traumatic stress disorder, the testimony sought was essentially the same; defense counsel wanted an opinion on the effect prior trauma would have on the defendant's state of mind. This court has limited such testimony to "experts in the psychiatric field." *Welch*, 270 Kan. at 235; see also *State v. Mays*, 277 Kan. 359, 85 P.3d 1208 (2004) (psychiatric testimony presented regarding effect of prior trauma upon defendant's reaction to events); *State v. Willis*, 256 Kan. 837, 888 P.2d 839 (1995) (limiting testimony to those with professional qualifications to diagnose post-traumatic stress disorder). Without an adequate foundation being proffered, the trial court appropriately found the evidence to be inadmissible.

We note that, at oral argument, appellate counsel suggested that Dr. Monkure's proffered testimony should be viewed as lay testimony, rather than expert testimony. Even if we were to accept that a proponent of evidence should be allowed to wait until appellate oral argument to explain the basis for admission of evidence, a position we are not inclined to adopt, the theory has no merit. K.S.A. 60-456 allows lay opinions under the following circumstances:

"(a) If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge

finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony."

The trial court stated that Dr. Monkure could testify regarding his experience with gunshot wounds, in other words based upon his perceptions. However, as already discussed, defense counsel expressed an intent to ask broader questions about gunshot violence in inner city African-American communities and the effect of trauma upon a person's future state of mind; these are not questions based upon a layperson's perceptions.

The trial court correctly ruled that there was not a proper foundation laid for the admission of expert testimony.

Under these circumstances, the defendant has failed to establish that the trial court improperly excluded relevant, admissible, and noncumulative evidence that was an integral part of the defense theory. See *Patton*, 280 Kan. at 156. Thus, we find no error.

## JURY INSTRUCTIONS

Next, the defendant argues that the jury instructions improperly stated the law with regard to premeditation and imperfect self-defense where the jury was not allowed to deliberate both concepts at the same time. The defendant concedes that he did not object to the instructions as given. Under K.S.A. 2005 Supp. 22-3414(3), no party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects, distinctly stating the matter objected to and the grounds for the objection before the jury retires, unless the instruction is clearly erroneous. "Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred." *State v. Bell*, 280 Kan. 358, 365, 121 P.3d 972 (2005).

The trial court instructed the jury on first-degree premeditated murder and the lesser included offenses of second-degree intentional murder, second-degree unintentional murder, voluntary manslaughter, and involuntary manslaughter.

Instruction No. 6 defined first-degree premeditated murder consistent with PIK Crim. 3d 56.01. Instruction No. 7 listed the

lesser included offenses of first-degree murder and informed the jury, consistent with PIK Crim. 3d 68.09, that if there was a reasonable doubt as to which of two or more offenses the defendant was guilty, he could be convicted of the lesser offense only. Instruction No. 8 stated: "If you do not agree that the defendant is guilty of the crime of murder in the first degree, you should then consider the lesser included offense of murder in the second degree—intentional," and defined that crime. Instruction No. 9 stated: "If you do not agree that the defendant is guilty of murder in the second degree—intentional, you should then consider the lesser included offense of murder in the second degree—unintentional," and defined that crime. Instruction No. 10 directed the jury: "In determining whether the defendant is guilty of murder in the second degree—intentional and unintentional, you should also consider the lesser offense of voluntary manslaughter," and defined that crime as "an intentional killing done upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person." These instructions were also consistent with PIK.

Instruction No. 17 defined "premeditation" consistent with PIK Crim. 3d 56.04:

" 'Premeditation' means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Instructions No. 18 and 19 informed the jury about self-defense and affirmative defenses consistent with PIK Crim. 3d 52.08 and 54.17 respectively.

During deliberations, the jury sent a note "[a]sking for clarification on premeditation." The trial judge responded: "I am unable to elaborate on the definition of 'Premeditation.' Please review Instruction #17." Defense counsel made no objection to this response.

This court has approved the PIK definition of premeditation in a series of cases. See *State v. Martis*, 277 Kan. 267, 302, 83 P.3d 1216 (2004); *State v. Hebert*, 277 Kan. 61, 89, 82 P.3d 470 (2004);

*State v. Pabst*, 273 Kan. 658, 661-63, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002); and *State v. Jamison*, 269 Kan. 564, 573, 7 P.3d 1204 (2000).

Furthermore, this court has previously approved the PIK method of ordering the jury's deliberation on lesser included offenses in *State v. Roberson*, 272 Kan. 1143, 1153-55, 38 P.3d 715 (2002), stating: "The pattern instructions offer an orderly method of considering possible verdicts. The pattern instructions offer a transitional statement that can be inserted at the beginning of the elements instructions of lesser offenses."

The defendant takes issue with these cases, arguing that the jury instructions were erroneous because they did not allow the jury to consider imperfect self-defense contemporaneously with premeditated first-degree murder. According to the defendant, the ordering of the jury's deliberations did not allow the jury to reconcile the concepts of premeditation and imperfect self-defense. The defendant contends that he may have premeditated his actions in the sense that he thought them over beforehand but, in doing so, his thought process led him to the honest but unreasonable conclusion that force was necessary. In making this argument, the defendant cites *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003).

In *Graham*, the defendant was charged with attempted first-degree murder and the jury was instructed on attempted second-degree murder and attempted voluntary manslaughter as lesser included offenses. The jury convicted the defendant of attempted second-degree murder. However, the jury was improperly instructed that it should only consider the lesser included offense of attempted voluntary manslaughter if it did not find the defendant guilty of attempted second-degree murder.

The court held:

"This 'reordering' deprived the jury of the opportunity to consider the mitigating circumstances of heat of passion or sudden quarrel which reduce an intentional homicide from murder to voluntary manslaughter. Both second-degree murder and voluntary manslaughter are intentional killings. An intentional homicide is reduced from murder to voluntary manslaughter if it is committed upon a sudden quarrel or in the heat of passion under K.S.A. 21-3403(a). Where the homicide is intentional and there is some evidence the homicide was committed

under the mitigating circumstances contained in K.S.A. 21-3403(a), the appropriate voluntary manslaughter instruction should be considered by the jury during its consideration of second-degree intentional murder. Thus, where there is evidence of mitigating circumstances justifying an instruction on voluntary manslaughter in a case where voluntary manslaughter is a lesser included offense, a failure to instruct the jury to consider such circumstances in its determination of whether the defendant is guilty of second-degree murder, is always error—and in most cases—presents a case of clear error." 275 Kan. at 837.

In other words, *Graham* held that because an intentional homicide may be reduced from murder to voluntary manslaughter if it is committed upon a sudden quarrel or in the heat of passion, a jury must be instructed to deliberate on both offenses simultaneously.

In *State v. Hurt*, 278 Kan. 676, 683, 101 P.3d 1249 (2004), this court held that the same rule does not hold true for first-degree premeditated murder and voluntary manslaughter. The court stated:

"Premeditation and heat of passion are mutually exclusive concepts. In other words, if a murder was premeditated, it cannot have been the result of heat of passion. [Citation omitted.] Thus, there is no need for the jury to consider evidence of heat of passion at the same time it considers evidence of premeditation." 278 Kan. at 683.

Most recently, in *State v. Bell*, 280 Kan. 358, this court considered the exact argument that the defendant is making here. Bell argued that both heat of passion and imperfect self-defense could reduce first-degree premeditated murder to the lesser offense of voluntary manslaughter; therefore, the jury should have been instructed to consider those offenses at the same time. This court rejected Bell's argument, citing both *Graham* and *Hurt*, and holding:

"[P]remeditated first-degree murder would not be reduced by an honest but unreasonable reliance on self-defense because, as with premeditation and heat of passion, the two are mutually exclusive concepts. If a murder were committed with premeditation, it would not be the result of an unreasonable but honest belief that circumstances justified deadly force. Premeditation requires reason; imperfect self-defense requires the absence of reason." 280 Kan. at 367.

The defendant takes issue with *Bell's* holding, arguing that imperfect self-defense and premeditation are not mutually exclusive

concepts because both concepts involve an underlying thought process. As the defendant puts it, imperfect self-defense does not require the absence of reason, only the absence of sound reason. In a related point of contention, the defendant argues that our definition of premeditation focuses unduly on the length of time between the thought and the act, rather than the nature of the thought process involved. He cites Justice Allegrucci's concurring opinion in *State v. Saleem*, 267 Kan. 100, 115, 977 P.2d 921 (1999), as authority. Combining these contentions, the defendant argues that he might have thought over the killing beforehand and also arrived at an honest but unreasonable belief that such killing was necessary to defend himself or another. Thus, he contends premeditation and imperfect self-defense must be deliberated by the jury simultaneously.

We disagree. The defendant's argument focuses on only the first part of our definition of premeditation, "to have thought over the matter beforehand," and ignores the second portion (added after the decision in *Saleem*), "in other words, to have formed the design or intent to kill before the act." PIK Crim. 3d 56.04. The State correctly points out that premeditation and imperfect self-defense are distinguishable on the basis that premeditation requires one to have thought over, not just any matter, but the matter of an intentional killing beforehand and to have formed the design or intent to kill before the act, whereas a person asserting imperfect self-defense has thought over the matter of defense of one's self or another, whether reasonable or unreasonable. Therefore, it is not error for the jury to be instructed to consider first-degree murder before considering imperfect self-defense.

In a letter submitted pursuant to Supreme Court Rule 6.09 (2005 Kan. Ct. R. Annot. 44), the defendant also cites a litany of cases from other jurisdictions which hold that the difference between murder and manslaughter is the presence or absence of malice and that imperfect self-defense obviates the element of malice, thus reducing murder to manslaughter. These cases are not particularly helpful given that, in Kansas, the element of malice was eliminated from both first-degree and second-degree murder

in 1993. See *State v. McCown*, 264 Kan. 655, 656-61, 957 P.2d 401 (1998).

We find no error in the instructions given to the jury in this case.

## HARD 50 SENTENCE

Next, the defendant argues that the trial court improperly refused to consider the mitigating evidence he presented during the sentencing hearing before imposing a hard 50 sentence.

K.S.A. 2005 Supp. 21-4635(b) provides that when a defendant is convicted of first-degree premeditated murder for a crime committed after July 1, 1999, the court shall determine whether the defendant shall be required to serve a mandatory hard 50 term. "In order to make such a determination, the court may be presented evidence concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances . . . and any mitigating circumstances." K.S.A. 2005 Supp. 21-4635(c). If the court finds that one or more aggravating circumstances exists and is not outweighed by any mitigating circumstances that exist, the court must impose the hard 50 sentence. K.S.A. 2005 Supp. 21-4635(d). A trial court's weighing of aggravating and mitigating circumstances is within its sound discretion and will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Lopez*, 271 Kan. 119, 141, 22 P.3d 1040 (2001).

In this case, the State relied on one aggravating factor, that the defendant knowingly or purposely caused a great risk of death to more than one person, in seeking a hard 50 sentence. See K.S.A. 2005 Supp. 21-4636(b). The State presented no additional evidence at the sentencing hearing but relied solely on the evidence presented at trial to support its argument.

The defendant claimed the following mitigating circumstances: that the crime was committed while the defendant was under the influence of extreme mental or emotional disturbances; that the victim was a participant in the defendant's conduct; and that the defendant acted under extreme duress. See K.S.A. 21-4637(b), (c), and (e). The defendant called psychologist Marilyn Hutchinson, who testified that the defendant suffered from post-traumatic

stress disorder and described the symptoms of that disorder and how they had affected the defendant's behavior and judgment.

After listening to the defendant's evidence, the trial court found that the mitigating circumstances alleged by the defendant existed:

"Based upon the mitigating factors pursuant to statute, I do think the mitigating factors presented by the defendant in this particular case are appropriate and not—I think they are in keeping with the spirit of the statute and that the victims were participants in the defendant's conduct and, two, that the defendant acted under extreme distress. And I think based upon the evidence presented by the defendant, certainly the factors and elements of posttraumatic stress disorder were present."

However, the trial court also found that the State had proven its alleged aggravating factor, that the defendant had caused a great risk of death to more than one person, as established by the evidence adduced at trial. The trial court also noted the jury's finding that the defendant had not acted in self-defense but rather in a premeditated manner and the evidence at trial that only one gun had been recovered at the scene.

The trial court then described its weighing of the aggravating and mitigating circumstances:

"Now, it's the Court's decision after weighing the State's aggravating factor and the defendant's mitigating factor that the aggravating factor outweighs the mitigating factor of distress and that the victims were participants in the defendant's conduct. . . . The State's evidence presented a picture in effect of an angry, but intentional and premeditated act on behalf of the defendant to kill the victim in this case. I understand all of the what if's and if only's and—on behalf of the defendant. The point is *the only criteria I can weigh is what was produced here in trial* and from the witness stand and that evidence and testimony is overwhelming and all of it supports the State's aggravating factor.

"So after considering the defendant's evidence in mitigation, there's no question in the Court's mind that the one aggravating factor by the State overwhelms and certainly outweighs the defense's mitigating factors." (Emphasis added.)

The defendant focuses upon the trial court's comment that "the only criteria I can weigh is what was produced here in trial" and interprets the comment as a ruling that the court could not give the defendant's mitigating evidence any weight because it was not introduced at trial.

The defendant's argument ignores the next phrase "and from the witness stand" which encompassed the sentencing hearing. As the State points out, when the trial court's comments are viewed in the context of the entire sentencing proceeding, it is clear that the trial court did properly consider and weigh the defendant's mitigating evidence. For example, the trial court specifically noted the diagnosis of post-traumatic stress disorder, a diagnosis not mentioned until the sentencing hearing. The court simply found that the State's aggravating factor outweighed the defendant's mitigating factors.

" 'Weighing aggravating and mitigating circumstances is not a numbers game. "One aggravating circumstance can be so compelling as to outweigh several mitigating circumstances' " and vice versa." *State v. Engelhardt*, 280 Kan. 113, 144, 119 P.3d 1148 (2005). The defendant has failed to establish an abuse of discretion.

## CONSTITUTIONALITY OF THE HARD 50 SENTENCING SCHEME

The defendant contends that the hard 50 sentencing scheme is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because a jury does not determine the facts that increase the penalty beyond a reasonable doubt. The defendant recognizes that this court has previously rejected this argument, but raises the issue to preserve it for future federal review.

This court upheld the hard 40 sentencing scheme as constitutional in *State v. Conley*, 270 Kan. 18, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001). Even after considering the most recent United States Supreme Court decisions, including the case cited by the defendant, *Ring v. Arizona*, 536 U.S. 584, 589, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002), this court has upheld the hard 50 sentencing scheme and *Conley*. See, *e.g.*, *State v. Hurt*, 278 Kan. 676, 686-88, 101 P.3d 1249 (2004); *State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *State v. Hebert*, 277 Kan. 61, 108, 82 P.3d 470 (2004); *State v. Boldridge*, 274 Kan. 795, 812, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003).

The defendant has cited no new case law and offered no new argument which might persuade us to depart from our previously stated position.

## CUMULATIVE ERROR

Finally, the defendant argues that cumulative error substantially prejudiced his right to a fair trial and requires reversal of his convictions. See *State v. Lumbrera,* 252 Kan. 54, 57, 845 P.2d 609 (1992). There are no errors in this case to accumulate.

Affirmed.