(302 P.3d 1084)
No. 108,461

DARLENE HUBBARD, *Appellant*, v. B. THEO MELLION, M.D.,
*Appellee*.

Opinion filed
May 17, 2013.

*Jerry K. Levy, Katherine L. Kirk,* and *Ronald L. Schneider,* of Law Offices of Jerry K. Levy, P.A., of Lawrence, for appellant.

*Anthony M. Singer* and *Matthew P. Sorochty,* of Woodard, Hernandez, Roth & Day, LLC, of Wichita, for appellee.

Before LEBEN, P.J., PIERRON and STANDRIDGE, JJ.

PIERRON, J.: Darlene Hubbard appeals the district court's granting of summary judgment in favor of B. Theo Mellion, M.D. Hubbard sued Dr. Mellion for medical malpractice after a surgical instrument broke during microdiscectomy surgery and a small piece of metal remained lodged in Hubbard's spinal disc. The district court held that Hubbard had filed a medical malpractice cause of action but she had failed to provide medical expert testimony establishing a standard of care and causal deviation and that neither res ipsa loquitur or the common knowledge exceptions applied to relieve Hubbard of her duty to present medical expert testimony. We reverse.

Hubbard is a registered nurse. On November 28, 2007, she injured her back assisting a patient into bed at Wesley Medical Center in Wichita. Hubbard received workers compensation benefits for her injuries. Hubbard sought treatment from Dr. Mellion for a herniated disc that was causing sharp pain in her buttocks and also down her right leg. Hubbard ultimately decided on surgical intervention in hopes of relieving her pain. On February 20, 2008, Dr. Mellion performed bilateral L5-L6 hemilaminectomies, foraminotomies, and a discectomy with an operating microscope on Hubbard.

During Hubbard's surgery, the tip broke off one of the medical instruments, a 2-mm upbiting pituitary rongeur (rongeur) manufactured by Aesculap, Inc. The rongeur is a forcep-type instrument that is used to reach into the disc space and remove the soft parts of the intervertebral disc. Dr. Mellion attempted to retrieve the broke tip but was unable to do so.

Dr. Mellion halted the surgery and consulted Hubbard's husband regarding the instrument failure and that he was unable to retrieve the broken tip. Dr. Mellion explained the options of either removing the disc (and broken tip) and doing a spinal fusion or stopping the surgery and monitoring Hubbard to see if there were any complications from leaving the tip in the disc. Hubbard's husband followed Dr. Mellion's recommendation and decided to stop the surgery. The pain in Hubbard's right leg was gone after the surgery, but then she had worse pain on her left side. During follow-up visits with Dr. Mellion, x-rays showed that the rongeur piece had not moved and had stayed in the same location in the disc.

Approximately 8 months after surgery, on October 9, 2008, Dr. John Gorecki performed a second surgery consisting of "[a]nterior lumbar interbody fusion L4-5 with SynFix including removal of foreign body followed by bilateral laminectomy with foramintomy L4-5, and posterior lateral fusion L4-5 with nonstructural allograft and autologous bone graft and pedical screws." Dr. Gorecki provided a letter on August 26, 2009, stating:

"This patient underwent complete discectomy and spinal fusion with removal of a retained foreign body with the disc space in October 2008. Clearly the retained fragment of pituitary rongeur within the disc space was a substantial irritant to the disc. It was like having a pebble in a person [sic] shoe. As a direct result the patient required spinal surgery with instrumented fusion."

On November 30, 2009, Hubbard filed a negligence action against Aesculap, Inc., Kansas Spine Hospital, L.L.C., and Dr. Mellion. Hubbard listed five theories of negligence:

"10. The upbiting pituitary instrument manufactured and sold by defendant Aesculap, Inc., was in a dangerous and defective condition due to the negligence of Aesculap, Inc. when it reached its destination, [Kansas Spine Hospital, L.L.C.], before February 8, 2008.

"11. Defendant [Kansas Spine Hospital, L.L.C.] negligently failed to inspect, test, and or safely maintain the pituitary instrument and provided same for use by defendant Mellion for the surgery he performed on plaintiff on February 28, 2008.
"12. Defendant Mellion negligently failed to inspect and or test the pituitary instrument before using it for the surgery he performed on plaintiff on February 28, 2008.
"13. Defendant Mellion negligently used the pituitary instrument causing the tip to break off and become lodged in the disc space of the plaintiff.
"14. Defendant Mellion negligently failed to remove the broken piece of the pituitary instrument from the plaintiff at the time of surgery on February 28, 2008."

Aesculap, Inc. and Kansas Spine Hospital, L.L.C. were eventually dismissed without prejudice. The parties proceeded with a lengthy period of discovery.

During Dr. Mellion's deposition, Hubbard's attorney questioned Dr. Mellion on the possible reasons why the rongeur broke. The questioning at the deposition was as follows:

"Q. [HUBBARD'S ATTORNEY]: Well, do you—can you see that there are probably three reasons—one of three reasons why it broke? Number one, operator error, that would be you getting a hold of something that was not supposed to be grabbed and you put pressure on it and it broke, that's a possibility, correct?
"A. [DR. MELLION]: That's a possibility.
"Q. Okay. Number two would be that the rongeur or the forceps was defective in some way in the way it was manufactured?
"A. That's a possibility.
"Q. And then the only other reason I can think of would be that it wasn't taken care of properly by the folks . . . at the hospital—
"MR. SOROCHTY [DEFENSE COUNSEL]: I move—
"Q. —who were in charge of seeing that their instruments were . . . inspected and kept in good condition?
"MR. SOROCHTY: Object to the form of the question. In addition, the doctor's asked and answered that question, says he doesn't know why. Just because you can only come up with three reasons doesn't mean those are the only exclusive ones, but you can answer, Doctor.
"A. I . . . agree, I don't believe that there can only be three concise reasons.
"Q. Okay, Okay. Give me more reasons.
"A. Instrument wear.
"Q. Okay.
"A. Any mechanical instrument, if used enough times will ultimately fail."

The remainder of Dr. Mellion's deposition involved discussions about wear and tear on the instruments and whether Dr. Mellion

had any criticism of Dr. Gorecki's decision to remove the rongeur piece and perform the spinal fusion surgery.

Hubbard's main expert in this case was Dr. Kevin Lease, a Ph.D. metallurgist engineer from the Department of Mechanical and Nuclear Engineering (Department) at Kansas State University. Dr. Lease was qualified to offer expert opinions as to the cause of fractured metal. In his capacity as the director of the Department's Mechanical Testing and Evaluation Lab, Dr. Lease analyzed the broken rongeur used in Hubbard's surgery by Dr. Mellion in order to determine what caused the tip of the metal rongeur to break off. After conducting this analysis, and based on his extensive training and experience in the field of metal, Dr. Lease ruled out the possibility that the rongeur failed due to a manufacturer's defect, ruled out the possibility that the rongeur failed because it had been improperly maintained, and ruled out the possibility that the rongeur had failed due to normal wear and tear. Based on his findings, Dr. Lease concluded that, of the four possibilities for failure identified in Dr. Mellion's deposition, only one remained a viable option: operator error. By way of explanation, Dr. Lease stated he believed the person operating the rongeur at the time it broke applied an amount of force in excess of what the instrument was intended to sustain.

Hubbard also provided expert testimony from Thorsten Barthelmes, a quality management team leader with Aesculap, Inc. Barthelmes examined Dr. Lease's report and concluded "the most probable cause is related to an overload situation during use."

Dr. Paul Stein, a neurosurgeon and Diplomat with the American Board of Neurological Surgery, performed an independent medical examination. Dr. Stein gave the following opinion:

"Ms. Hubbard underwent a lumbar laminectomy and diskectomy by Dr. Mellion on 2/20/08 during which there was a complication in which the upper jaw of a pituitary forceps broke while in the disk space. Firstly, let me state that I have no criticism of the care provided by Dr. Mellion. The pathology and symptomatology for which the surgery was being done was appropriate to the procedure as planned. The records reflect no deviation of proper procedure or care by Dr. Mellion during surgery. The pituitary forceps being used was the appropriate instrument for use inside the disk to remove this material. It was being used within the disk which is its appropriate usage. After the upper jaw of the forceps broke,

which is not an unheard of event, Dr. Mellion made an appropriate attempt to retrieve the fragment. When he could not do so from his surgical exposure, he rightly discussed the situation with the patient's husband and provided the appropriate options. The option chosen was reasonable and appropriate and his follow up was proper. At that point, Ms. Hubbard decided to seek further medical attention elsewhere.

"In regard to the actual instance of breakage of the instrument, this is not at all unknown in neurosurgical practice. In my 33 years of active neurosurgical practice in Wichita, I have performed thousands of lumbar disk surgeries. During that practice, on one occasion, the upper jaw of a pituitary forceps, manufacturer unknown, broke in the disk just as occurred in this case. I am aware of this happening to other neurosurgeons in the past as well. These are instruments which must be delicate yet strong in order to be satisfactory for the purpose of their use. Aesculap is a very well known and respected manufacturer of such instruments for neurosurgical practice and I suspect that most neurosurgeons in the United States have used equipment from this manufacturer. It would not be practical to use a brand new instrument in every case, nor is it possible to do structural analysis on each instrument prior to use. While I am not a metallurgist and cannot discussed [sic] that aspect of the manufacturer, I have used the equipment of this manufacturer with confidence for many years while doing neurosurgery and would have no concern regarding future use if I were still doing such surgery."

The defense offered the expert testimony of Dr. David Fritz, a neurosurgeon. In preparing to give his testimony, Dr. Fritz examined all the depositions and the reports of Dr. Lease and Dr. Stein. At his deposition, Dr. Fritz acknowledged that he was not qualified as an expert on why something made of metal might break and he did not know why the rongeur used during Hubbard's surgery broke. Dr. Fritz testified that surgical instruments such as the rongeur used here fail less than 1% of the time.

Dr. Fritz further testified that the rongeur tip had broken off here in the disc space exactly where proper use of the instrument occurs and that the location of the broken tip would not have caused the postsurgical pain experienced by Hubbard.

In the Agreed Pretrial Order, Hubbard provided the following contentions and theories of recovery:

"[Hubbard] contends that when [Mellion] performed spine surgery on her he negligently and careless[ly] used a device known as an upbiting pituitary rongeur, hereafter referred to as forceps. [Hubbard] alleges [Mellion] used the forceps contrary to instructions of the manufacturer in that too much force was applied causing the forceps to break and become lodged in the spine of [Hubbard]. [Mel-

lion] did not remove the broken part of the forceps. As a result of [Mellion's] negligence [Hubbard] later had to have additional spine surgery performed by another spine surgeon to remove the broken piece of the forceps and to fuse the spine. As a direct result of the negligence of [Mellion] [Hubbard], who was a registered nurse at Wesley Medical Center, has been unable to return to work."

Dr. Mellion filed a motion for summary judgment based on Hubbard's failure to designate a medical expert qualified to testify as to the applicable standard of care for a surgeon performing this type of surgery. The district court ultimately granted summary judgment in Dr. Mellion's favor based on Hubbard's failure to establish the proper standard of care. More specifically, the court found Hubbard's mechanical engineer expert established that the rongeur malfunctioned because of operator error but that she must still offer expert testimony to prove that such operator error was outside the established standard of care. The court was not willing to extend the res ipsa loquitur doctrine to the case because there were a number of different ways the rongeur could have malfunctioned, especially in light of the testimony that instruments like these sometimes just break. The court also found the common knowledge exception to the medical expert testimony would not be extended either because that would imply that the rongeur would not malfunction without a doctor acting outside the standard of care and that negligence was required in order to have that kind of defect.

## STANDARD OF REVIEW

We review a district court's decision to grant or deny a motion for summary judgment as follows:

" ' " ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must

be denied." ' " [Citations omitted.]' " *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009).

## ANALYSIS

The crux of Hubbard's argument on appeal is that the district court erred by requiring her to present expert medical testimony on the proper standard of care in order to survive summary judgment. Before addressing the merits of her argument, we find it helpful to review some legal fundamentals concerning medical malpractice.

"Medical malpractice is negligence of a healthcare professional in the diagnosis, care, and treatment of a patient." *Perkins v. Susan B. Allen Memorial Hospital*, 36 Kan. App. 2d 885, 888, 146 P.3d 1102 (2006). In a negligence case alleging medical malpractice, the plaintiff must prove the following elements:

"(1) The physician owes the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the physician breached this duty or deviated from the applicable standard of care; and (3) the patient was injured and the injury proximately resulted from the physician's breach of the standard of care. [Citations omitted.]" *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008).

Negligence may be proved in a medical malpractice case by direct evidence or by circumstantial evidence; in other words, evidence from which an inference of negligence can be made. A finding of negligence may not, however, be inferred from facts that merely establish lack of success or an adverse result from treatment. *Esquivel*, 286 Kan. at 296. In the absence of direct or circumstantial evidence, negligence will not be presumed. *Perkins*, 36 Kan. App. 2d at 888.

Because the diagnosis, care, and treatment of a patient are typically issues outside the knowledge of an average person who has not received specialized training, expert testimony generally is required to establish the appropriate standard of care in medical malpractice cases. *Perkins*, 36 Kan. App. 2d at 888. There are, however, exceptions to this requirement. Specifically, experts are not needed to establish the appropriate professional standards of

care where either the doctrine of common knowledge or the doctrine of res ipsa loquitur applies.

The doctrine of common knowledge applies when a breach of reasonable care would be apparent to and within the common knowledge and experience of the average person who has not received any specialized training. *Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22 (1978). The res ipsa loquitur doctrine applies when a layperson could find that the patient's condition was such that would ordinarily not have occurred if due care had been exercised. *Tatro v. Lueken*, 212 Kan. 606, 611, 512 P.2d 529 (1973). Although related, there is a difference between the common knowledge doctrine and res ipsa loquitur. In a common knowledge case, a plaintiff presents evidence of the specific act or omission that allegedly deviated from the applicable standard of care and evidence of the injury sustained. The jury then utilizes common knowledge and experience to assess the wrongfulness of the specific act or omission and attribute the plaintiff's injury to that wrongful act or omission. *Perkins*, 36 Kan. App. 2d at 888. In a res ipsa loquitur case, however, a plaintiff need only present evidence of the injury and is not required to prove a standard of care or a specific act or omission. Under the doctrine of res ipsa loquitur, the mere fact that the injury occurred raises an inference of negligence. *Perkins*, 36 Kan. App. 2d at 889.

Having set forth the relevant legal principles, we now turn to Hubbard's argument on appeal. Specifically, Hubbard argues the district court erred in granting summary judgment in favor of Dr. Mellion for the following reasons: (1) the record contains adequate expert testimony from which the jury could conclude Dr. Mellion breached the applicable standard of care for a surgeon performing this type of surgery; (2) a standard of care expert is not required in this case because the common knowledge exception to the expert witness requirement is applicable; and (3) a standard of care expert is not required in this case because the negligence can be presumed in this case under the doctrine of res ipsa loquitur.

*Existing Expert Testimony*

Hubbard claims the record contains adequate expert testimony from which the jury could conclude Dr. Mellion breached the ap-

plicable standard of care for a surgeon performing this type of surgery and, thus, the district court erred in finding that only a physician could provide standard of care testimony. Specifically, Hubbard argues Dr. Lease's opinion that the rongeur failed due to operator error is tantamount to an opinion that the defendant negligently applied too much force and caused the instrument to break. But Hubbard's argument is really an attempt to "bootstrap" an expert opinion regarding the reason why a metal instrument fractured during surgery into an expert opinion on the proper standard of care for a medical professional who uses the metal instrument during surgery. Such an argument is without merit.

*The Common Knowledge Exception to the Expert Witness Requirement*

The common knowledge exception in medical malpractice cases applies if what is alleged to have occurred in the diagnosis, treatment, and care of a patient is so obviously lacking in reasonable care and the results are so bad that the lack of reasonable care would be apparent to and within the common knowledge and experience of mankind generally. *Webb*, 223 Kan at 490.

Kansas courts have identified three essential elements to the common knowledge exception: (1) the plaintiff has asserted a claim of medical malpractice; (2) the care or result of the care is patently bad; and (3) a person without the pertinent medical knowledge can assess the wrongfulness of the diagnosis, treatment, or care and attribute the plaintiff's injury to the wrongful conduct without the assistance of expert testimony. Whether or not the common knowledge exception applies to a given set of facts is a question of law. It is a narrow exception and has rarely been applied. *Perkins*, 36 Kan. App. 2d at 889.

Here, Hubbard alleges Dr. Mellion negligently applied too much force when using the rongeur during her surgery, which caused the instrument to break. The court is not persuaded that this type of medical malpractice is a matter of common knowledge. The proper procedure for using a rongeur during surgery is not a matter within the province of the common person; thus, a breach of reasonable care would not be apparent to and within the com-

mon knowledge and experience of the average person who has not received any specialized training. See *Webb*, 223 Kan. at 490; *Perkins*, 36 Kan. App. 2d at 888.

*The Res Ipsa Loquitur Exception to the Expert Witness Requirement*

The doctrine of res ipsa loquitur is one of evidence, rather than substantive law. Generally it becomes applicable in a negligence action where there is no direct proof of negligence, but where circumstances are established so as to leave no conclusion other than that the defendant is at fault. Because of the favorable presumption of skill and care and the nature of medical practice and treatment, which usually requires expert testimony to establish fault, a determination regarding the applicability of res ipsa loquitur in a medical malpractice action is difficult. Nevertheless, three conditions must be met for the doctrine of res ipsa loquitur to apply: (1) The thing or instrumentality causing the injury or damage was within the exclusive control of the defendant; (2) the occurrence must be of such kind or nature as ordinarily does not occur in the absence of someone's negligence; and (3) the occurrence must not have been due to contributory negligence of the plaintiff. See *Bias v. Montgomery Elevator Co.*, 216 Kan. 341, 343, 532 P.2d 1053 (1975). "The rationale behind the doctrine is said to be that when the defendant has exclusive control of the instrumentality he has it within his power to produce evidence of the cause of the injury, while the plaintiff is without such knowledge and must therefore rely on proof of the circumstances." *Bias*, 216 Kan. at 343.

The doctrine of res ipsa loquitur is available in an appropriate case to a plaintiff alleging medical malpractice based upon negligence. Applicability must be decided on a case-by-case basis. See *Voss v. Bridwell*, 188 Kan. 643, 660, 364 P.2d 955 (1961). Therefore, we must determine whether the district court erred in concluding that res ipsa loquitur was unavailable to Hubbard under the facts of this case.

*Exclusive Control*

To meet the first condition, the plaintiff must have evidence to establish: (a) The specific thing or instrumentality which actually caused his or her injury or damage and (b) the thing or instrumentality which caused his or her injury or damage was within the exclusive control of the defendant. Thus, the doctrine does not apply where the thing or instrumentality which caused the injury or damage is unknown or cannot be shown. *Arterburn v. St. Joseph Hospital & Rehabilitation Center*, 220 Kan. 57, 65, 551 P.2d 886 (1976).

With regard to the first requirement, Hubbard alleges the instrumentality which actually caused her injury and damage was the tip of the rongeur, which broke off and became lodged in disc space within her spine. We find sufficient evidence in the record on summary judgment to establish that the broken rongeur was the specific instrumentality which actually caused her injury or damage. Hubbard testified at her deposition that in the months following the surgery, she suffered continuing pain as a result of the instrument tip remaining in her disk material. In October 2008, Hubbard underwent a second spinal surgery, this time performed by Dr. Gorecki. Dr. Gorecki performed a spinal fusion and removed the instrument tip. In 2009, Dr. Gorecki drafted a letter stating in part: "Clearly the retained fragment of pituitary rongeur within the disc space was a substantial irritant to the disc. It was like having a pebble in a person [*sic*] shoe. As a direct result the patient required a spinal surgery with instrumented fusion." At his deposition, Dr. Gorecki testified that the contents of his August 26, 2009, letter were truthful.

We also find sufficient evidence in the summary judgment record to establish that the rongeur was within the exclusive control of the defendant when the injury occurred. Notably, Kansas courts do not require the plaintiff to eliminate all other possible causes of the accident in order to establish exclusive control. See *Bias*, 216 Kan. 341, Syl. ¶ 2. Instead, the plaintiff is only required to produce sufficient evidence from which a reasonable person could say that—on the whole—it was more likely than not there was

negligence on the part of the defendant. If the evidence establishes that it was at least equally probable the negligence was that of another, the theory of res ipsa loquitur is inapplicable. *Bias*, 216 Kan. 341, Syl. ¶ 2.

There appears to be no dispute that Dr. Mellion was in exclusive control of the rongeur during the surgery and when the tip broke. Nevertheless, Dr. Mellion argues the res ipsa loquitur doctrine is inapplicable in this particular case because it was at least equally probable that the negligence was that of another and that such negligence occurred before Hubbard's surgery. Specifically, Dr. Mellion argues he played no role in the design or manufacture of the rongeur, he was not the manufacturer of the rongeur, he did not own the rongeur, he played no role in the maintenance of the rongeur, he was not the individual charged with the responsibility to pull the rongeur from service at the end of its useful life, and the rongeur had been used by an unknown number of physicians prior to its failure in February 2008.

We are not persuaded by Dr. Mellion's argument here, primarily because in opposing summary judgment, Hubbard presented the expert opinion of Dr. Lease, who examined the rogeur at issue in his lab and—based on his extensive training and experience in the field of metallurgy—ruled out the possibility that the tip of the rongeur broke off due to a manufacturer's defect, improper maintenance, and normal wear and tear. As Prosser and Keeton remind us, the element of "exclusive control" must not be hardened into a "fixed, mechanical, and rigid rule":

" 'Control' if it is not to be pernicious and misleading, must be a very flexible term. It may be enough that the defendant has the right or power of control, and the opportunity to exercise it, as in the case of an owner who is present while another is driving the owner's car, or a landowner who permits visitors to come on his premises. It is enough that the defendant is under a duty which he cannot delegate to another, as in the case of a surgeon who allows a nurse to count the sponges. It is enough that the defendant shares the duty and the responsibility, as in the case of the landlord of a building from which an electric sign falls into the street." Prosser and Keeton, Law of Torts § 39 p. 250 (5th ed. 1984).

Based on Dr. Lease's testimony, we find Hubbard met her burden to produce sufficient evidence from which a reasonable person

could say that—on the whole—it was more likely than not there was negligence on the part of Dr. Mellion. In so finding, we necessarily reject Dr. Mellion's claim that the district court cannot rely on Dr. Lease's expert opinion for purposes of summary judgment due to the fact that Dr. Lease's opinion will be inadmissible at trial because Hubbard cannot lay the proper foundation necessary to introduce it to the jury.

K.S.A. 60-456 governs the admission of opinion testimony. Under the provisions of K.S.A. 60-456(b), admissible expert opinions are limited to those "(1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." "The proponent of expert opinion testimony must lay the foundation to establish these requirements." *State v. Lawrence*, 281 Kan. 1081, 1088, 135 P.3d 1211 (2006). To that end, Dr. Mellion argues that Dr. Lease is not qualified to testify as an expert under K.S.A. 60-456 because (1) Dr. Lease possesses no facts or data regarding the amount of force the rongeur was designed to withstand or the amount of force applied to the rongeur by Dr. Mellion during Hubbard's surgery or the specific design load of the rongeur; and (2) Dr. Lease does not have the special knowledge, skill, experience, or training to qualify as an expert on use of a rongeur during surgery.

But Dr. Mellion's argument challenges the foundation that would be required if Dr. Lease testified as an expert on "use" of the rongeur during surgery, a subject about which Dr. Lease was not testifying. Dr. Lease only offered his opinion as to the whether the actual rongeur at issue in this lawsuit broke because of some defect in manufacturing, because of improper maintenance, or because of normal wear and tear. The record reflects that Dr. Lease is certainly qualified to offer an expert opinion as to the cause of fractured metal: He is a Ph.D. metallurgist engineer from the Department of Mechanical and Nuclear Engineering at Kansas State University and has had extensive training and experience in the field of metallurgy. Moreover, the record reflects that Dr. Lease rendered his opinion based on an actual physical examination of the broken rongeur at issue in this case. Based on his expertise in

the field of metallurgy and his analysis of the broken rongeur, Dr. Lease then ruled out three of the four possibilities identified by Dr. Mellion as reasons that could have caused the instrument to break while Dr. Mellion was using it—manufacturing defect, improper maintenance, and normal wear and tear—to conclude that only one of the possibilities identified by Dr. Mellion remained a viable option: operator error. Although an inference can be drawn from Dr. Lease's testimony that the only viable alternative to explain why the rongeur broke is that Dr. Mellion applied too much force, Dr. Lease's opinion simply cannot be characterized as direct medical testimony presented to establish that Dr. Mellion failed to exercise the reasonable degree of learning and skill ordinarily possessed by like members of the medical profession in performing Hubbard's surgery.

Viewing all of the evidence in the summary judgment record and resolving all facts and inferences which may reasonably be drawn from that evidence in favor of Hubbard, as we are required to do, we find Hubbard produced sufficient evidence from which a reasonable person could say it was more likely than not that the instrument which caused Hubbard's injury or damage was within the exclusive control of Dr. Mellion.

### The Injury Is of a Kind Which Ordinarily Does Not Occur in the Absence of Someone's Negligence

In order to survive summary judgment on the second element of her res ipsa loquitur claim, there must be sufficient evidence in the record from which a jury could infer that the tip of a rongeur does not ordinarily break off and become lodged in a patient's disc space absent Dr. Mellion's failure to use proper care. Although we are inclined to believe that the prospective jurors in this case have some basis in common knowledge and experience from which they could reasonably conclude that the tip of a surgical instrument does not ordinarily break off and become lodged in a patient's disc space absent negligence on the part of the surgeon, the record in this case actually reflects evidence from two different experts to support this conclusion. Defense expert Dr. Fritz, a neurosurgeon, testified that surgical instruments such as the rongeur used by Dr.

Mellion in Hubbard's surgery here fail less than 1% of the time. And independent medical examiner Dr. Stein, a neurosurgeon and Diplomat with the American Board of Neurological Surgery, drafted a report stating that in his 33 years of active neurosurgical practice in Wichita, he performed thousands of lumbar disc surgeries and on only one occasion did the upper jaw of a rongeur break off in the disc space. When we consider this evidence in conjunction with the expert opinion of Dr. Lease, who examined the rongeur at issue and ruled out the possibility that the tip of the rongeur broke off due to a manufacturer's defect, improper maintenance, and normal wear and tear, we find sufficient evidence from which a jury could infer that the tip of a rongeur does not ordinarily break off and become lodged in a patient's disc space absent the surgeon's failure to use proper care.

### The Injury Must Not Have Been Due to Contributory Negligence of Plaintiff

Finally, although Hubbard has not specifically alleged that she was not contributorily negligent, the court finds that Hubbard has nevertheless satisfied this third element of a res ipsa loquitur claim. The record reflects that Hubbard was incapacitated during surgery, thereby rendering her physically unable to contribute to any injury allegedly occurring during the course of the operation.

### CONCLUSION

In granting summary judgment in favor of Dr. Mellion on Hubbard's medical malpractice claim, the district court concluded that the doctrine of res ipsa loquitur was not applicable under the facts of this case:

"In [a res ipsa loquitur case], it would suggest that the only way that the error could happen would be absent negligence and—or with negligence, and given the testimony that's been provided in the case, even giving the ultimate conclusion of Dr. Lease of what happened, that doesn't mean that's the only way it could happen. As Mr. Levy [Hubbard's attorney] pointed out, there's a number of different manners in which a device can malfunction, so to suggest that it's a—simply because it malfunctioned, it's a case of strict negligence, I'm not ready to suggest the law is to that level in cases like this, especially. The testimony has been that these things break. Everyone knows things break. Your pen breaks on you occa-

sionally, putting too much pressure on the point at the top when you are writing. I don't know that that's negligence. It's just something that happens. I'm not—I don't think there's any evidence to support the claim of res ipsa [loquitur] in this case and so I'm going to rule for the defendant on that claim or that theory."

We disagree with the district court's analysis and, as our discussion above reflects, find sufficient evidence in the summary judgment record from which a jury could find each of the elements necessary to prove medical malpractice under a theory of res ipsa loquitur: (1)(a) Hubbard was injured as a result of the tip of the rongeur breaking off and lodging in her disc space during surgery; (1)(b) the rongeur which caused her injury was within the exclusive control of Dr. Mellion during her surgery; (2) the tip of a rongeur does not ordinarily break off and become lodged in a patient's disc space absent a surgeon's failure to use proper care; and (3) Hubbard herself did not contribute in any way to her injury. See *Bias*, 216 Kan. at 343. We therefore hold that Hubbard may rely upon res ipsa loquitur in presenting her case to a jury. Whether the inference of negligence arising from res ipsa loquitur will be convincing to a jury is a question to be answered by that jury.

Reversed.